**Sean T. HADDON, Petitioner,**

v.

**EXECUTIVE RESIDENCE AT THE WHITE HOUSE, Respondent.**

**Executive Residence at the White House, Petitioner,**

v.

**Sean T. Haddon, Respondent.**

**Nos. 01–6001, 01–6002.**

United States Court of Appeals, Federal Circuit.

DECIDED: Nov. 27, 2002.

Rodney R. Sweetland, III, Law Office of Rodney R. Sweetland, of Arlington, Virginia, argued for petitioner, Sean T. Haddon.

Matthew M. Collett, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, DC, argued for respondent, Executive Residence at the White House. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General, and Marleigh D. Dover, Attorney.

Before CLEVENGER, SCHALL, and LINN, Circuit Judges.

CLEVENGER, Circuit Judge.

Sean T. Haddon by petition seeks review of the final decision of the United States Equal Employment Opportunity Commission ("EEOC"), which held that neither Mr. Haddon's separation from employment at the Executive Residence at the White House ("Executive Residence") nor the Executive Residence's subsequent refusal to rehire him was in retaliation for Mr. Haddon's exercise of protected rights. The Executive Residence by cross petition challenges the final decision of the EEOC that the Executive Residence engaged in reprisal discrimination against Mr. Haddon when it temporarily rescinded his access to the White House.

For the reasons set forth below, we affirm the EEOC's decision that the Exec-

utive Residence did not discriminate against Mr. Haddon when it discharged him and subsequently decided not to re-hire him. We reverse the EEOC's decision that the Executive Residence violated Mr. Haddon's rights when it temporarily rescinded his access to the White House.

## I

Mr. Haddon began working as an assistant chef at the Executive Residence in July 1988. He alleged that, beginning around January 1992, he was discriminated against by Chief Usher Walters because of his engagement to an African American woman. Mr. Haddon alleged that he was passed over for a promotion to First Assistant Chef (or "Sous Chef") in 1992 because of this discrimination. Mr. Haddon filed an EEO complaint in April 1993, alleging that this discriminatory reason prevented him from being promoted.

Around the time of his EEO complaint, Mr. Haddon filled out a background check form for updated security clearance on April 6, 1993. On May 20, the White House Counsel's Office requested a Level II background investigation on Mr. Haddon. On May 27, 1993, the Washington Field Office of the FBI received a message from the FBI Headquarters requesting a Level II background investigation of Mr. Haddon. This message mentioned an "unspecified derogatory issue" related to Mr. Haddon's employment at the Executive Residence and suggested that Walters would be a good person to talk to because he had knowledge of the matter.

FBI Agent Sculimbrene began investigating the matter on June 7. He talked with Walters and a number of other Executive Residence employees during the course of the investigation. Some of Mr. Haddon's co-workers referred to him as unstable or strange, and on June 16 one of them discussed threats that Mr. Haddon had allegedly made against the President.

On June 16, Sculimbrene met with Walters again to discuss his findings and whether Mr. Haddon might pose a threat to the First Family. Sculimbrene then talked with a White House Secret Service Agent, sharing the information he had learned, after which Mr. Haddon's White House pass was temporarily revoked beginning June 16, 1993. Mr. Haddon was escorted out of the Executive Residence by Secret Service Agents. The Secret Service then conducted an investigation to determine whether Mr. Haddon was a threat to the First Family, ultimately concluding that he was not. His White House pass was restored to him on June 18, and he returned to work the following day.

The next major chain of events began in 1994, when the Executive Chef was asked to resign from his position, and the entire current kitchen staff was informed that they were being dismissed so the new Executive Chef could hire his own staff. In the end, all the former kitchen staff except for Mr. Haddon was rehired. Mr. Haddon did interview for a position with the new Executive Chef, who was not impressed by Mr. Haddon's interview and declined to recommend him for a position.

While Chief Usher Walters was the person vested with final hiring authority, Walters stated that he made his decision not to hire Mr. Haddon because the new Executive Chef had not recommended him. However, it appears that Walters harbored some personal animosity toward Mr. Haddon, as evidenced by a memorandum entitled "Thoughts on White House Kitchen Staffing" that Walters had written in November 1993. This memorandum detailed Walters' thoughts on White House kitchen renovation and staffing, and it recommended the termination of Mr. Haddon ("Chef Haddon must go!").

After he was discharged and not rehired, Mr. Haddon filed another EEO complaint, alleging: (1) that he was denied a promotion because of his relationship with an African American woman, (2) that the temporary suspension of his White House pass was in retaliation for his first EEO complaint, and (3) that the reason for his discharge was also retaliatory. The Executive Residence denied the allegation of discrimination and cited security issues arising from Mr. Haddon's alleged threats as the motivation for the suspension. Furthermore, the Executive Residence then claimed that even if Mr. Haddon had never brought an EEO complaint, he still would have been discharged and not rehired. According to the Executive Residence, Mr. Haddon had violated the First Family's privacy by speaking to the media, made false allegations against his co-workers, filed lawsuits against his co-workers, and made threats against his co-workers. Combined with Mr. Haddon's poor relationship with his co-workers and his poor job performance, these acts sufficed to make Mr. Haddon unfit for continued employment with the Executive Residence.

The Administrative Judge ("AJ") to whom Mr. Haddon's complaint was assigned conducted a three-day hearing in October 1997. The AJ concluded that the refusal of the Executive Residence to promote Mr. Haddon, and its decision to remove and not rehire him, were neither discriminatory nor in reprisal for his having earlier filed an EEO complaint. The AJ explicitly found that even if Mr. Haddon had never filed an EEO complaint, the Executive Residence would have removed him and not rehired him. The AJ did rule in Mr. Haddon's favor on his complaint that his access to the White House had been stripped in reprisal for his earlier filing of an EEO complaint. The findings of fact and conclusions of law made by the AJ are contained in his written decision dated December 2, 1997.

Both parties timely appealed the initial decision of the AJ to the EEOC, and on March 2, 2001, the EEOC issued its final decision, in which it affirmed the previous decisions of the AJ. On timely petition and cross petition, the parties appeal to this court. Mr. Haddon presses only his claim of unlawful discrimination in connection with his discharge from his position and the Executive Residence's decision not to reemploy him. His claim of discrimination regarding his failure to achieve promotion to Sous Chef is waived, and therefore will not be discussed further.

II

■ This case arises under 2 U.S.C. § 1219, part of the Government Employee Rights Act of 1991, 2 U.S.C. §§ 1201–1224, which has since been repealed. However, the statute still applies to cases, such as this one, that were pending before October 7, 1997, the effective date of the repeal. *See* Presidential and Executive Office Accountability Act, Pub.L. No. 104–331, § 5(a)-(b), 110 Stat. 4072 (1996). Section 1219 applies to presidential appointees and extends the anti-discrimination protection of 2 U.S.C. § 1202 to them. Section 1202 requires that all personnel actions be made free from discrimination based on "race, color, religion, sex, or national origin, within the meaning of section 2000e–16 of Title 42." Section 2000e–16 is part of Title VII, so section 1219 in effect subjects personnel actions involving presidential appointees to certain requirements of Title VII.

Under 2 U.S.C. § 1219(a)(3)(A), a party may appeal a final order of the EEOC to this court. However, there is a question of whether 2 U.S.C. § 1219 extends to claims of retaliation. Section 2000e–16, the anti-discrimination provision of Title VII incorporated by sections 1202 and 1219, is silent

about retaliation claims, dealing only with discrimination based on race or gender. The section of Title VII that deals with retaliation claims is 42 U.S.C. § 2000e–3, which is mentioned in neither 2 U.S.C. § 1202 nor 2 U.S.C. § 1219. This appears to suggest that this court may lack jurisdiction over a retaliation claim made by a presidential appointee. However, as noted by the Executive Residence, which is not challenging jurisdiction, other courts have held that Congress incorporated the retaliation prohibition from section 2000e–3 into section 2000e–16. *See Ayon v. Sampson,* 547 F.2d 446, 449–50 (9th Cir.1976); *see also Hale v. Marsh,* 808 F.2d 616, 619 (7th Cir.1986). The Supreme Court has not spoken on the issue, nor has this court. However, we see no reason to reach a different result than the other circuits that have addressed this issue. It is quite sensible to conclude that Congress intended for section 1202, and thus section 1219, to include reprisal. Protection against discrimination would be extremely thin if an employer could freely fire an employee for filing a discrimination claim. Therefore, we hold that section 1219 gives this court jurisdiction over reprisal actions of presidential appointees.

### III

Our standard of review is set out in 2 U.S.C. § 1219(a)(3)(C). We must set aside a final order if it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law, (2) not made consistent with required procedures, or (3) unsupported by substantial evidence. *Id.* Otherwise, we must affirm the decision of the EEOC.

We must contend with and decide two issues. First is whether the EEOC was correct in affirming the AJ's decision that the Executive Residence did not retaliate against Mr. Haddon when it discharged him and did not rehire him. To determine this we must consider both the correct legal standard for burden of proof and whether the Executive Residence's reasons for discharging Mr. Haddon violated his constitutional rights. The second issue before us is whether the EEOC was correct in affirming the AJ's decision that the Executive Residence retaliated against Mr. Haddon when it escorted him from the White House and temporarily suspended his White House pass. Since Mr. Haddon may only complain about discriminatory acts in connection with adverse personnel actions, *see Hashimoto v. Dalton,* 118 F.3d 671, 679 (9th Cir.1997) (stating that one of the requirements for a successful claim of retaliation is that the plaintiff was subjected to an "adverse employment decision"), we need not reach the question of whether the finding of retaliation was supported by substantial evidence if we find that the temporary suspension was not an adverse personnel action.

### Legal Standard for Burden of Proof

■ Mr. Haddon alleges that the Executive Residence discharged him and subsequently declined to rehire him in retaliation for his filing of an EEO complaint. He claims that the AJ erroneously evaluated this issue under the prima facie case/burden shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), rather than the standard for mixed motive cases set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and that the EEOC erred by failing to address this issue. Mr. Haddon argues that he presented "direct evidence of retaliation" and thus the mixed motive approach rather than the prima facie case approach was required. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct.

613, 83 L.Ed.2d 523 (1985) (stating that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination" (citing *Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977))).

In *Price Waterhouse,* the Supreme Court held that Title VII was "meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." 490 U.S. at 241, 109 S.Ct. 1775. The Court further held, however, that in mixed motive cases "an employer shall not be liable if it can prove that, even if it had not taken [the prohibited factor] into account, it would have come to the same decision regarding a particular person." *Id.* at 242, 109 S.Ct. 1775. Different courts have taken various approaches to the question of how much evidence a plaintiff is required to submit before he is entitled to rely on *Price Waterhouse.* The Second Circuit has stated that a "plaintiff will be entitled to a burden-shifting instruction on the *Price Waterhouse* defense where the evidence is sufficient to allow the trier to find both forbidden and permissible motives." *Rose v. New York City Bd. of Educ.,* 257 F.3d 156, 161 (2d Cir.2001) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181 (2d Cir.1992)). Other courts have set out more stringent tests for direct evidence. In *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1358–59 (11th Cir.1999), the Eleventh Circuit stated that direct evidence must show a discriminatory or retaliatory attitude and "must indicate that the complained-of employment decision was *motivated* by the decision-maker's" discriminatory or retaliatory attitude toward the claimant. The court went on to note that " 'only the most blatant remarks, whose intent could be nothing other than to discriminate' ... will constitute direct evidence of discrimination." *Id.* at

1359 (quoting *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir. 1990)). The Eleventh Circuit has also defined direct evidence as a statement by the decisionmaker/employer that "reflects a discriminatory attitude" and "ties the discriminatory attitude to the relevant employment decision...." *Wright v. Southland Corp.,* 187 F.3d 1287, 1294 (11th Cir.1999). The Fifth Circuit has defined direct evidence as including "any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 329 (5th Cir.1994). Although this court has never squarely addressed the issue, we have noted that direct evidence is rarely available in retaliation cases and that it is usually necessary to rely on circumstantial evidence. *See Webster v. Dep't of the Army,* 911 F.2d 679, 689 (Fed.Cir.1990).

The evidence that Mr. Haddon sets forth as "direct evidence" of retaliation is not terribly direct at all, and does not qualify under any of the definitions of direct evidence. Mr. Haddon first points to a memorandum from Walters to the First Lady's Chief of Staff entitled "Thoughts on White House Kitchen Staffing" that refers to the EEO complaint. However, Walters, in testimony the AJ found credible, said the memorandum was intended only to make the First Lady's Chief of Staff aware of the circumstances and express his disagreement with Mr. Haddon's allegations. This memorandum gave Walters's opinions on the strengths and weaknesses of the kitchen staff and recommended that they all be dismissed so the new chef could select his own staff. In the memorandum, Walters referred to Mr. Haddon as a problem that "must go." Nothing in the memorandum appears discriminatory or retaliatory on its face. It is not direct evidence.

Mr. Haddon's assertion that statements by new Executive Chef Scheib qualify as direct evidence is also incorrect. First, it was Walters rather than Scheib who made the final hiring decision; Scheib made only recommendations. Second, the AJ credited Scheib's testimony that he did not consider the EEO complaint in his decision not to recommend Mr. Haddon for a position. All the evidence pointed to by Mr. Haddon requires some inferences to get at a retaliatory motive for his discharge and does not qualify as direct evidence. Therefore it was not error to apply the *McDonnell Douglas* approach rather than the *Price Waterhouse* approach.

■ Under the *McDonnell Douglas* framework, the plaintiff must first make out a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. In the context of a retaliation claim, this is done by showing that: (1) the plaintiff participated in a protected activity, (2) the defendant had knowledge of this participation, (3) the defendant took adverse action against the plaintiff, and (4) there was a "causal connection" between the plaintiff's protected activity and the defendant's adverse action against the plaintiff. *Hollins v. Atlantic Co.,* 188 F.3d 652, 661 (6th Cir.1999) (citing *Christopher v. Stouder Mem'l Hosp.,* 936 F.2d 870, 877 (6th Cir.1991)). *See also Webster,* 911 F.2d at 689. If the plaintiff is successful in showing a prima facie case, the burden then shifts to the defendant to show that there was a legitimate nondiscriminatory reason for the rejection. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Finally, the plaintiff is given the opportunity to show by a preponderance of the evidence that the stated reason is a mere pretext, and the real reason was prohibited discrimination. *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

■ Under the *McDonnell Douglas* approach, the AJ concluded that Mr. Haddon's discharge was not retaliatory, determining that Mr. Haddon had successfully made out a prima facie case but that the reasons asserted by the Executive Residence were legitimate and not pretextual. However, even if the AJ erred by applying the *McDonnell Douglas* test instead of the *Price Waterhouse* test, the AJ also made an explicit finding that the "[r]espondent has shown by a preponderance of the evidence that even if Complainant had never brought an EEO complaint, he would have been separated." This finding shows that the Executive Residence's action would have satisfied the *Price Waterhouse* standard that Mr. Haddon advocates. While the EEOC opinion did not discuss which evidentiary standard was proper, the EEOC reviewed the AJ's fact findings thoroughly and concluded that the decision was supported by the evidence, noting the AJ's finding that "even though the Chief Usher wanted complainant removed, the preponderance of the evidence showed that complainant would have been removed for other reasons as well." We find no error in this decision and affirm.

The judicial estoppel argument that Mr. Haddon makes in his reply brief is without merit. He argues that the Executive Residence cannot assert that the *Price Waterhouse* standard still applies in mixed-motive retaliation cases despite changes to Title VII in 1991 that apparently made the standard more difficult to meet. However, Mr. Haddon is actually arguing *for* application of the *Price Waterhouse* standard, so we fail to see why he is contesting this point. Regardless, judicial estoppel would not apply in this case. The Executive Residence did originally argue in court that Mr. Haddon could not bring a straight Title VII claim, and won that case. *See Haddon v. Walters,* 836 F.Supp. 1, 1–3 (D.D.C.1993). The claim is not now

brought as a Title VII case but rather under section 1219, which incorporates a particular provision of Title VII and applies it to presidential appointees, making it necessary for the Executive Residence to discuss the relevant portions of Title VII law.

### First Amendment Claim

Mr. Haddon alleges that some of the reasons given by the Executive Residence for discharging and then not rehiring him were not legitimate reasons because they violated his constitutional rights. In this regard, he points to statements he made about the First Family in the media and the lawsuits he filed against his co-workers. Mr. Haddon claims that the statements he made to the media (in interviews with *The Washington Post* and radio stations) were protected First Amendment speech for which he may not be terminated. The statements he made dealt with the First Family's food preferences, the staff's refusal to heed the President's food allergies, the President's lateness for dinner, and the poor service the staff was giving the First Family.

 In order for a public employee's speech to qualify for First Amendment protection, this court has noted that:

> The Supreme Court of the United States has established a two-part test to determine whether the speech of a public employee is protected under the First Amendment. The court must determine whether the speech addresses a matter of public concern and if so, whether the government's interest in the effective and efficient fulfillment of its responsibilities outweighs the employee's right to speak.

*Henry v. Dep't of the Navy,* 902 F.2d 949, 951 (Fed.Cir.1990). These are both questions of law. *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001). An employee's speech addresses a matter of public concern if it can "be fairly construed as relating to any matter of political, social, or other concern to the community...." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The inquiry depends on the "content, form, and context [of the speech], as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. While at first glance Haddon's comments in the media may seem like matters of public concern, the answer is not that clear. We must keep in mind that just because the public may be interested in hearing about a subject, that subject does not automatically become a matter of public concern for purposes of the First Amendment. The Supreme Court has cautioned against being too quick to decide that events occurring in a government office are matters of public concern, stating that "[t]o presume that all matters which transpire within a government office are of public concern would mean that every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.* at 149, 103 S.Ct. 1684.

Mr. Haddon argues that "[i]ntentionally poor service by government employees, and serving foods which adversely affect the health of the President ... are unquestionably matters of public concern." However, under this logic, nearly any private detail concerning the First Family could be turned into a matter of public concern. That cannot be the law. Further, Mr. Haddon's public statements went beyond simply expressing his concern for the President's health and the poor service given to the President by the staff. He also discussed the President's lateness for meals and related details of specific incidents that would seem unnecessary to a discussion of the President's health or the staff's poor service. We conclude that the

statements Mr. Haddon made to the media are not related to matters of public concern and are thus not statements for which a public employee is entitled to protection under the First Amendment.

Even if we were to conclude that Mr. Haddon's statements related to matters of public concern, the balancing of interests required by the second part of the First Amendment test this court articulated in *Henry* favors the Executive Residence. If the "interest of the agency as employer in promoting the efficiency of the public service it performs ... outweigh[s] [the employee's] interest in speaking on a public issue without fear of retaliatory dismissal," then the employee's speech is not protected. *Brown v. Dep't of Transp., Fed. Aviation Admin.*, 735 F.2d 543, 546 (Fed.Cir. 1984). To state the balancing test another way:

> Even if an employee's speech is on a matter of public concern, a government employer is entitled to restrict that speech if it can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the state, as employer, in promoting effective and efficient public service.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir.2002) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). This is a fact-specific inquiry, involving factors such as "whether the speech would create problems in maintaining discipline and harmony among co-workers" and "whether the employment relationship is one in which personal loyalty and confidence are necessary." *Id.* The factors here favor the Executive Residence; clearly, it is important that White House staff can be trusted to keep private matters private.

As a second leg of his First Amendment argument, Mr. Haddon points to the suits he filed while serving at the Executive Residence and argues these suits cannot be used as legitimate reasons for his discharge. Those suits fall in two categories: first, his two EEO complaints, and second, civil suits that he brought against co-workers in the Executive Residence. Suits in the second category did not involve the EEO complaints.

The Executive Residence cited the suits brought by Mr. Haddon as one of the reasons it would have dismissed and not rehired him, because of the disruption caused in the workplace after the filing of the suits—not because the suits themselves were filed. Mr. Haddon does not take issue with the allegation by his employer that his many lawsuits did indeed disrupt affairs in the workplace. Instead, he contends that the ripple effect on workplace morale and efficiency resulting from the filing of the lawsuits is irrelevant in law, and that even if such ripple effects flow from the filing of the lawsuits, the Executive Residence cannot claim an innocent, non-EEO related motive in defending its decision to remove and not rehire him.

■ We agree with Mr. Haddon that insofar as his argument is connected to the filing of the EEO complaints, he has some authority on his side. The Fourth Circuit has held that an agency cannot claim as an innocent reason for adverse action collateral consequences of the filing of EEO complaints. *See Curl v. Reavis*, 740 F.2d 1323, 1329 n. 5 (4th Cir.1984) (affording protection to the employee not as a matter of constitutional law, but under the EEO statute).

■ The significant disruption caused in the Executive Residence by Mr. Haddon's lawsuits, however, ensued more from the suits he brought against named co-workers, who necessarily were distracted and even perhaps distraught by the filing of

the suits and the evident workplace debate thereby engendered. These suits are not EEO-related. For example, the suit Mr. Haddon filed against one co-worker stemmed from that co-worker's alleged threat to cause Mr. Haddon physical harm. Mr. Haddon cites us no precedent, and our independent research has found none, to support the proposition that an employer may not take account of disruption caused by non-EEO complaints when making decisions as to whether the filer of the complaints has created a workplace situation that is adverse to efficient accomplishment of legitimate workplace objectives. Indeed, precedent points in the other direction, holding that the preservation of close working relationships and prevention of "disruption" in the workplace can vitiate claims of First Amendment infractions when employees complain publicly about working conditions. *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. The Supreme Court has also noted the government's wide latitude to discharge "employees whose conduct hinders efficient operation" because retaining such employees "can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.* at 151, 103 S.Ct. 1684 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). As with the EEO complaints, Mr. Haddon is not being punished for having filed the writ. It is the collateral workplace consequences flowing from the protected filing that affords the employer a reason to question the performance of the employee. Furthermore, we note that the AJ's opinion discussed other ways in addition to the filing of lawsuits in which Mr. Haddon's conduct caused disruption in the workplace, including his threats to sue other co-workers, his alleged threats of physical harm against co-workers, and his accusations of intentionally poor service by co-workers.

When it comes to EEO complaints themselves, the law may be generously protective of the EEO filing. But when the employee engages in garden-variety civil litigation against co-workers, we see no concomitant policy reason to enlarge the umbrella of protection for the employee. So long as the employer has not taken action against the employee solely for having filed lawsuits, which is not alleged with regard to any of the suits here, we think Mr. Haddon's First Amendment challenge pales to insignificance. Though there may be a kernel of truth in his allegation that the workplace furor caused by the EEO complaints is irrelevant, this kernel cannot overcome the Executive Residence's legitimate consideration of the aftermath of the other complaints to form a view about the viability of Mr. Haddon's career in the Executive Residence.

### Adverse Employment Action

██ If the removal of Mr. Haddon from the White House and suspension of his pass does not qualify as an actionable adverse employment action, then the finding that this act was retaliatory must be reversed. The Executive Residence argues that the AJ erred in not requiring Mr. Haddon to show that the suspension of his White House pass qualified as an adverse employment action, and that the EEOC erred in failing to address the issue and correct it. We agree. The AJ, relying on *United States Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), decided that once the Executive Residence produced evidence of nondiscriminatory motive, the issue of whether Mr. Haddon made a prima facie case disappeared and the focus was only on whether the act was retaliatory. *Aikens* does say that the prima facie

case framework disappears after the defendant shows evidence of nondiscriminatory intent, *id.* at 715, 103 S.Ct. 1478, but this does not mean that it becomes irrelevant whether the action qualified as an adverse employment action. There still must be action that is discriminatory within the meaning of Title VII, *id.*, and an adverse employment action is necessary to have discrimination within the meaning of Title VII, as it has been incorporated into section 1219. Using the presumption "serves only to force the employer to produce certain evidence; once the employer has done so, the plaintiff still bears the burden of proving *illegal* discrimination [or retaliation] by a preponderance of the evidence." *Wright,* 187 F.3d at 1302 (emphasis added). Illegal retaliation must involve an adverse employment decision. It was error for the AJ to construe *Aikens* to circumvent that requirement and for the EEOC to endorse the error.

This court generally addresses adverse employment actions in the context of appeals from the Merit Systems Protection Board (MSPB), where adverse employment actions are defined by statute. However, the adverse employment action at issue in this case arises under 2 U.S.C. § 1219, which incorporates Title VII law. Therefore we will look to how other circuits have defined what qualifies as an adverse employment action in Title VII cases. An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage." *Gagnon v. Sprint Corp.,* 284 F.3d 839, 850 (8th Cir.2002) (quoting *Spears v. Mo. Dep't of Corr. & Human Res.,* 210 F.3d 850, 853 (8th Cir.2000)). Courts have declined to create an exclusive list of activities that qualify as adverse employment actions because there are so many special circumstances, but adverse actions generally include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465–66 (7th Cir.2002) (quoting *Ribando v. United Airlines, Inc.,* 200 F.3d 507, 510 (7th Cir.1999)). Most of the actions that courts have recognized as adverse employment actions are more tangible and permanent than the short suspension without loss of pay at issue here. Further, Mr. Haddon's assertions about how the suspension adversely affected his relationships with his co-workers does not turn this into an adverse employment action. On the contrary, "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Brooks v. City of San Mateo,* 229 F.3d 917, 929 (9th Cir. 2000) (citing *Strother v. S. Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996)).

Internal investigations such as the one at issue here generally do not qualify as adverse employment actions. *See, e.g., Von Gunten v. Maryland,* 243 F.3d 858, 869 (4th Cir.2001) (finding that employer's placement of employee on short administrative leave with pay to allow time for internal investigation of complaint in accordance with procedures was not an adverse employment action). While the initiation of criminal proceedings against an employee has been considered an adverse action, *see Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986–87 (10th Cir.1996), this is because a criminal trial, which is public, could seriously harm future employment prospects. *Id.* In contrast, the investigation of Mr. Haddon was not public. Mr. Haddon's removal from the White House and the temporary suspension of his pass is not the type of action that courts have

considered to be an adverse employment action.

Although MSPB law does not apply to this case, it does provide an extensive body of precedent that may be looked to for analogy. An analogy to MSPB law here suggests that Mr. Haddon's removal and two-day suspension of his pass did not qualify as an adverse employment action. Under the law applicable to most federal employees, only a suspension of greater than fourteen days qualifies as an adverse employment action entitling the employee to petition the MSPB for review. *See 5 U.S.C. § 7512 (2000); Jennings v. Merit Sys. Prot. Bd.,* 59 F.3d 159, 160 (Fed.Cir. 1995). Although these rules apply to employees in the competitive service and do not cover Mr. Haddon as a presidential appointee, it would make little sense to treat escorting Mr. Haddon from the White House and suspending his pass for two days as an adverse employment action when, under MSPB law, a suspension without pay of up to fourteen days is not. This analogy further supports our conclusion that the action at issue in this case did not qualify as an adverse employment action, and the EEOC erred in affirming the AJ's decision that it was an actionable retaliatory act.

## CONCLUSION

On the first issue, whether the EEOC applied the correct legal standard when it determined that the Executive Residence had not discriminated against Mr. Haddon when he was discharged from his position and not rehired, we conclude that the answer is yes. On the second issue, whether the EEOC was correct in affirming the AJ's decision that the Executive Residence retaliated against Mr. Haddon when it escorted him from the White House and temporarily suspended his White House pass, we conclude that the answer is no.

An actionable adverse employment action is required to find illegal retaliation, and the action here was not an actionable adverse employment decision. Accordingly, we affirm-in-part and reverse-in-part the decision of the EEOC.

## COSTS

No costs.

*AFFIRMED–IN–PART AND RE-VERSED–IN–PART.*