Tom BRIGGS, Petitioner,

v.

**MERIT SYSTEMS PROTECTION BOARD, Respondent,**

and

**United States, Intervenor.**

No. 02–3217.

United States Court of Appeals, Federal Circuit.

DECIDED: June 11, 2003.

Matthew S. Yeo, Steptoe & Johnson LLP, of Washington, DC, argued for petitioner. With him on the brief was James C. Bailey.

Jeffrey A. Gauger, Attorney, Office of the General Counsel, Merit Systems Protection Board, of Washington, DC, argued for respondent. With him on the brief was Martha B. Schneider, Acting General Counsel.

Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for intervenor. With him on the brief was David M. Cohen, Director. Of counsel were Jeanne E. Davidson, Assistant Director; and E. Michael Chiaparas, Attorney.

Before LOURIE, SCHALL, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

Tom Briggs appeals from the decision of the Merit Systems Protection Board granting summary judgment that Briggs violated the Hatch Act and ordering the District of Columbia Public Schools ("DCPS") to remove Briggs from his teaching position. *Special Counsel v. Briggs*, No. CB–1216–01–0002–T–1, 91 M.S.P.R. 669, 2002 WL 523228 (MSPB Mar. 25, 2002). Because Briggs's attacks on the constitutionality of the Hatch Act are not meritorious, we affirm.

## BACKGROUND

A. *The Hatch Act and the Teacher Exception*

1. *The Present Statutory Provisions*

The Hatch Act prohibits certain government employees from engaging in certain political activities. *See generally* 5 U.S.C. §§ 1501–08, 7321–26 (2000). The Act prohibits both federal and state/local employees from being partisan candidates for elected office. 5 U.S.C. § 7323(a)(3) ("[A federal] employee may not ... run for the nomination or as a candidate for election to a partisan political office."); *see also id.* § 1502(a)(3) ("A State or local officer or employee may not ... be a candidate for elective office."). Covered federal employees include "any individual ... employed or holding office in ... the government of the District of Columbia, other than the Mayor or a member of the City Council or the Recorder of Deeds." *Id.* § 7322(1)(C). DCPS teachers fall under that definition. However, state and local public school teachers are exempted from the Hatch Act. *Id.* § 1501 (" 'A state or local officer or employee' ... does not include ... an individual employed by an educational or research institution, establishment, agency or system."). There is no similar exception for federal employees.

2. *Legislative History*

To better understand the Hatch Act in effect today, an understanding of its history is helpful. The Act was first enacted in

1939 out of concerns about the harmful effects of political activities by government workers. The 1939 Act affected only federal employees. A year later the Act was amended in two ways important to this case. First, coverage was extended to state and local employees. That extension was an exercise of Congress's spending power, as the law was limited to state and local employment "in connection with any activity which is financed in whole or in part by laws or grants made by the United States or any federal agency." 5 U.S.C. § 118k(a) (1958). Second, the 1940 amendments brought District of Columbia employees within the Act's coverage as federal employees.

In 1942 the Act was amended again, this time introducing a teacher exception, applicable to teachers in any state, locality, or the District of Columbia. *Id.* § 118k–1. Briggs cites numerous statements from the 1942 legislative history expressing strong support for the teacher exception. In 1966, the Act was recodified and bifurcated into the two separate chapters of Title 5 where the provisions appear today: §§ 1501–08 (applying to state and local employees) and §§ 7321–26 (applying to federal employees). The recodification did not materially change the law, at least as it pertains to the teacher exception, which was maintained in both new sections. In part, § 7324(c) at that time read: "Subsection (a) of this subsection does not apply to an individual employed by an educational or research institution, establishment, agency, or system which is supported in whole or in part by the District of Columbia." 5 U.S.C. § 7324(c) (1970).

Starting in the mid-seventies, several attempts were made to relax the Act's prohibitions generally. Those attempts culminated in amendments that were enacted in 1993, which, most significantly, retracted the Act's prohibition against "tak[ing] an active part in political management or in political campaigns." *Compare id.* § 7324(a)(2) *with* 5 U.S.C. § 7323(a) (2000). The 1993 amendments also removed the DC teacher exception that had been codified at § 7324(c). The rationale for its removal, as pointed out by Briggs and not contested by the government, is unexplained in the legislative history.

## B. *Briggs's Political Candidacy and His Removal by the MSPB*

Briggs was a social studies teacher at Dunbar Senior High School, one of the schools in the DCPS, when in July 2000 he filed a Declaration of Candidacy to run on the DC Statehood Green Party slate for the Ward Two seat on the District of Columbia Council. *Special Counsel v. Briggs,* No. CB–1216–01–0002–T–1, slip op. at 6 (MSPB May 3, 2001) (*"Initial Decision"*). The United States Office of Special Counsel ("OSC") twice warned Briggs that his candidacy violated the Hatch Act and offered him the opportunity to withdraw his candidacy without disciplinary action, but Briggs remained a candidate throughout the election, which he ultimately lost. *See id.*

In October 2000, the OSC filed a complaint at the MSPB alleging that Briggs was in violation of the Hatch Act and seeking disciplinary action. In January 2001, after the election, the OSC filed a motion for summary judgment. Briggs responded with a cross-motion for summary judgment raising the affirmative defense that the Hatch Act violates the First Amendment and Equal Protection Clause of the United States Constitution. Finding no material facts in dispute, the administrative law judge ("ALJ") assigned to the case agreed with the OSC that Briggs was covered by the Hatch Act and that his candidacy was a *per se* violation of the Act. *Id.* at 7. The ALJ declined to rule on Briggs's affirmative defense, holding that

the MSPB was without authority to declare legislation unconstitutional. *Id.* at 8. The ALJ went on to determine that removal was the appropriate penalty for Briggs because his "continued candidacy in the face of warnings that the activity violated the Hatch Act demonstrates deliberate disregard of law and, therefore, warrants removal." *Id.* at 9.

Briggs appealed the ALJ's initial decision to the full Board, which denied his petition for review, thus rendering the initial decision final. *See* 5 C.F.R. § 1201.113(b) (2002). As a result, the DCPS terminated Briggs on April 23, 2002. Shortly thereafter, on June 17, 2002, the DCPS rehired him for the same position he had just vacated, and he is apparently still employed in that position at the present time. Briggs has never received any salary for the interim period between his removal and rehiring.

Briggs timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

The scope of our review in an appeal from a decision of the Board is limited. We must affirm the Board's decision unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (2000); *Gibson v. Dep't of Veterans Affairs,* 160 F.3d 722, 725 (Fed.Cir. 1998). Briggs's only arguments, constitutional challenges to the Hatch Act, implicate the "otherwise not in accordance with law" aspect of our standard of review. Because the Board did not address those challenges, there is no constitutional analysis for us to review. Even if the Board had addressed those challenges, we would assess them without deference to the

Board's analysis. *See King v. Dep't of Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997) ("We review the Board's determinations of law for correctness, without deference to the Board's decision.").

Briggs first argues that the Board did have the authority to rule on his constitutional claims because administrative agencies may address constitutional issues that arise in connection with the application of statutes that are the subject of their jurisdiction. In any event, according to Briggs, the constitutional issues are properly before this court, irrespective of the Board's authority to decide constitutional issues.

As to his First Amendment claim, Briggs argues that the Hatch Act's prohibition against his political candidacy is an unlawful restraint on his freedom of speech. Because his candidacy is a form of speech regarding matters of public concern, Briggs contends, citing *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that the government bears the burden of justifying any adverse employment action taken in retaliation for that speech. Furthermore, according to Briggs, because an entire class of people is affected, the government's burden is even heavier. Briggs contends that the government cannot satisfy the *Pickering* test because Congress has not found that specific problems exist arising from DC school teachers' political candidacies. In fact, Briggs stresses the fact that the legislative history of the Hatch Act shows a strong sentiment in favor of the teacher exception, and the change in the law that removed the DC teacher exception appears to have been an oversight.

As to his equal protection claim, Briggs argues that strict scrutiny should be applied to the Act's disparate treatment of DCPS teachers compared to state teachers. Briggs thus contends that the government must show that the disparate

treatment is narrowly tailored to serve a compelling governmental interest. Briggs contends that the government cannot meet that burden when, in his view, all the evidence that had been before Congress indicated that there was no reason to treat DCPS teachers differently from teachers employed by the states. In fact, according to Briggs, there is not even a rational basis supporting the difference in treatment.

The government responds, first, that the Board's authority to decide Hatch Act complaints is circumscribed by 5 U.S.C. § 1215, which does not grant the Board authority to rule on the Act's constitutionality. The government contends that while agencies can generally determine constitutional applicability, they cannot determine whether legislation is constitutional. Nonetheless, the government agrees that this court may address Briggs's constitutional challenges.

As to Briggs's First Amendment challenge, the government responds that the Hatch Act does not prohibit Briggs from speaking on political matters; it only prohibits him from being a partisan candidate, and, unlike free speech, there is no fundamental right to be a political candidate. The government further contends that the Act meets the *Pickering* test, citing *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). According to the government, it need not point to evidence specifically identifying a need to include DCPS teachers under the Act, and that, in any event, there are several factors that support application of the Act to any government employees, including teachers. Finally, the government contends that a policy judgment to the contrary is for Congress, not the courts, to make.

Regarding Briggs's equal protection claim, the government responds that the distinction drawn by the Hatch Act between DCPS teachers and public school teachers in states and localities neither impinges upon a fundamental right nor is drawn along "suspect" lines and that rational basis review is therefore appropriate. According to the government, rational bases for the lack of a teacher exemption for DCPS teachers are that (1) DCPS teachers are not similarly situated to state or local teachers because Congress has direct legislative authority over the DCPS, and (2) because the states retain all powers not delegated to the federal government—unlike the District of Columbia, which has only those powers that Congress is willing to grant it—states have the authority to set their own limits on their employees' political activities, and states should be given leeway to exercise that authority if they so choose.

### A. *Justiciability*

■ Before proceeding to the merits of the case, we are obliged to consider our jurisdiction in light of the apparent fact that Briggs has been rehired. Thus, the question is whether there is still a case or controversy. The answer is that this appeal does present a case or controversy because Briggs, if his removal was unlawful, may be entitled to back pay for the period between his removal and subsequent rehiring.

■ Whether the Board should have considered Briggs's constitutional arguments is an issue we need not decide. Both parties agree, and we concur, that we may consider his arguments and decide the constitutionality of the Hatch Act in this appeal. Given the Board's consistent refusal to pass on the constitutionality of legislation, *e.g., Malone v. Dep't of Justice*, 13 MSPB 81, 14 M.S.P.R. 403, 406 (1983); Briggs's attempt, albeit futile, to raise the issue before the Board; the purely consti-

tutional nature of the issue; the lack of a need to develop a factual record before adjudication; and the lack of a need for Board expertise to decide the issue, we conclude that the requirement of administrative exhaustion is not applicable in this case. *See Beard v. Gen. Servs. Admin.,* 801 F.2d 1318, 1321 (Fed.Cir.1986). We therefore proceed to the merits of Briggs's contentions.

### B. *Freedom of Speech*

■ The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. That text has been interpreted from time to time, and an extensive body of First Amendment jurisprudence has evolved. Most of that jurisprudence, dealing with freedom of speech by the general citizenry, is not relevant to this case. What is relevant here is a branch of that jurisprudence concerning speech restrictions the government may place on its own employees. The freedom of speech enjoyed by a government employee is not as extensive as that enjoyed by a non-employee because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. One of those interests is the establishment and maintenance of a separation between political activity, on the one hand, and the performance of government functions by the government workforce, on the other hand, as addressed by the Hatch Act. Our analysis of that interest in relation to the First Amendment is guided principally by the following decisions of the Supreme Court: *Pickering; Letter Carriers; United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); and *United States v. National Treasury Employees Union,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*").

*Pickering,* although not involving political candidacy or the Hatch Act, does involve public speech by a public school teacher. In that case, an Illinois public school teacher was removed for writing a letter to the editor of a newspaper criticizing the school board's use of funds. for athletics. 391 U.S. at 564, 88 S.Ct. 1731. In reversing the removal, the Court set forth a balancing test between two competing factors: "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731; *see also Haddon v. Executive Residence at the White House,* 313 F.3d 1352, 1360–61 (Fed.Cir. 2002). The Court refused to lay down a bright line rule, opting instead for the flexible balancing test. *Id.* at 569, 313 F.3d 1352. Its conclusion in favor of Pickering's right to express his views in a newspaper reflects the importance of permitting knowledgeable school officials to state their views publicly on matters of public concern.

Cases both before and after *Pickering* have rejected claims that the Hatch Act violates the First Amendment. In *Mitchell,* a pre-*Pickering* case, a mechanic employed at the U.S. Mint violated the Hatch Act and was subsequently removed. He challenged his removal on the ground that the Act violated various constitutional provisions, including the First Amendment. 330 U.S. at 95, 67 S.Ct. 556. Without distinguishing among the particular provisions at issue, the Court rejected those challenges. *Id.* In particular, the Court rejected Mitchell's argument that Congress may not constitutionally regulate the

political activities of industrial workers to the same extent as administrative workers because the former are not in positions where impartiality in public matters is required. *Id.* at 100–01, 67 S.Ct. 556. In rejecting that argument, the Court cited three reasons that may have motivated Congress to extend the Act's prohibitions to all government employees, regardless of their responsibilities: (1) elimination of political factors as a possible basis for preferential treatment of employees by their supervisors; (2) prevention of political leaders using government employees to build "political machine[s]"; and (3) prevention of "the cumulative effect on morale of political activity by all employees who could be induced to participate actively." *Id.* at 101, 67 S.Ct. 556.

In *Letter Carriers,* a post-*Pickering* case, the Court again upheld the Hatch Act against attacks on its constitutionality. In that case, several federal employees challenged the Act's then-existing proscription against taking "an active part in political management or in political campaigns." 5 U.S.C. § 7324(a)(2) (1970) (later abrogated). The Court rejected that challenge, explaining that the Hatch Act survives the *Pickering* balancing test: "Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." *Letter Carriers,* 413 U.S. at 564, 93 S.Ct. 2880. The Court noted four "obviously important interests": (1) "the impartial execution of the laws"; (2) maintaining public "confidence in the system of representative Government"; (3) not allowing the Government workforce to "be employed to build a powerful, invincible, and perhaps corrupt political machine"; and (4) ensuring that "advancement in the Government service not depend on political performance." *Id.* at

565–66, 93 S.Ct. 2880. The Court went on to reaffirm *Mitchell* using strong language:

> We unhesitatingly reaffirm the Mitchell holding that Congress had, and has, the power to prevent [a government employee] from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as … becoming a partisan candidate for, or campaigning for, an elective public office…. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.

*Id.* at 556, 93 S.Ct. 2880.

In contrast, in *NTEU,* the Court struck down a ban on honoraria in the Ethics Reform Act of 1989, which broadly prohibited federal employees from accepting compensation for giving speeches or writing articles, regardless of the topic and its relation to their employment duties. 513 U.S. at 457, 115 S.Ct. 1003. The Court held that the ban violated the First Amendment because the government did not satisfy its burden under the *Pickering* test. *Id.* at 466, 115 S.Ct. 1003. That burden was a "heavy" one because the ban applied to "a broad category of expression by a massive number of potential speakers," *id.* at 467, 115 S.Ct. 1003, and "chill[ed] potential speech before it happen[ed]," *id.* at 468, 115 S.Ct. 1003. The Court expressly distinguished the honoraria ban from the Hatch Act, which the Court described as a protection of the rights of government employees:

> Like the Hatch Act, the honoraria ban affects hundreds of thousands of federal employees. Unlike partisan political ac-

tivity, however, honoraria hardly appear to threaten employees' morale or liberty. Moreover, Congress effectively designed the Hatch Act to combat demonstrated ill effects of Government employees' partisan political activities. In contrast, the Government has failed to show how it serves the interests it asserts by applying the honoraria ban to respondents. *Id.* at 471, 115 S.Ct. 1003. Stated another way: "A federal employee, such as a supervisor of mechanics at the mint, might impair efficiency and morale by using political criteria to judge the performance of his or her staff. But one can envision scant harm, or appearance of harm, resulting from the same employee's accepting pay to lecture on the Quaker religion or to write dance reviews." *Id.* at 473, 115 S.Ct. 1003. Recognizing that with both the honoraria ban and the Hatch Act the government's justifications for the restrictions placed on its employees' speech required a prediction of the harms that might result from that restricted speech, the Court felt that those predictions concerning the Hatch Act were due deference while those concerning the honoraria ban were not. *Id.* at 476 n. 21, 115 S.Ct. 1003 ("We deferred to the Government's predictions in upholding the Hatch Act, but that statute's employee-protective rationale provided much stronger justification for a proscriptive rule than does the Government's interest in workplace efficiency. Deferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections.").

Notwithstanding the several failed First Amendment-based challenges to the Hatch Act and the significant differences between the Hatch Act and the restraints on government employee speech that have been held to violate the First Amendment, Briggs mounts yet another First Amendment-based attack on the Hatch Act. He

does not do so against the Hatch Act in general, for precedent clearly precludes such an attack. Instead, his challenge is more specific and aimed at the Act as applied to DCPS teachers. In other words, it is the absence of an exception for DCPS teachers that he claims to be a violation of the First Amendment. Thus, the issue in this case boils down to whether the government can meet its burden of demonstrating that the Hatch Act's prohibition on partisan political candidacy, as applied to DCPS teachers, is an appropriate "balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. We conclude that it has met that burden.

■ As an initial matter, Congress has the power to prevent federal employees from running for elected office. *Mitchell,* 330 U.S. at 95, 67 S.Ct. 556. That general rule was reaffirmed in *Letter Carriers,* in which the Court specifically applied the *Pickering* balancing test to the Hatch Act and concluded that the Act does not violate the First Amendment. 413 U.S. at 556, 93 S.Ct. 2880. Indeed, in dictum in *Letter Carriers,* the Supreme Court recognized that a statute that forbade the same type of political activities as at issue here would unquestionably be valid. *Id.* Thus, we must begin from the premise that the Hatch Act generally strikes an appropriate balance under *Pickering.*

Indeed, the reasoning of *Mitchell* and *Letter Carriers* applies equally well to DCPS teachers, and a DCPS teacher's interest in expression by being a partisan political candidate is more than offset by the government's interest in promoting the efficiency of its public services by protections that the Hatch Act provides DCPS

teachers, as with all government employees, from political forces. In particular, there is an interest in ensuring that a teacher's professional advancement should not be influenced because of assisting, or not assisting, a supervisor's political candidacy, or by a teacher's possible future authority, if elected, over the school system. Nor should teachers be subject to "the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively," *Mitchell,* 330 U.S. at 101, 67 S.Ct. 556, or should a teacher's right to vote his or her conscience be chilled in any way by the political candidacies of supervisors or colleagues.

Nothing in the most recent Supreme Court case, *NTEU,* upsets the appropriateness of the balance recognized in *Letter Carriers* or suggests that a different balance is needed for DCPS teachers. *NTEU* carefully distinguished the honoraria ban it was reviewing from the Hatch Act, noting both that the employees' speech prohibited by the honoraria ban implicated the First Amendment to a greater extent than the speech interest in political candidacy and that the government has a greater interest in restricting the political activities of its employees than it does in restricting their paid speaking and writing. *See NTEU,* 513 U.S. at 476 n. 21, 115 S.Ct. 1003. The same is true with DCPS teachers. And nothing in the Hatch Act precludes the teachers from writing letters to the editor or otherwise speaking out on matters relating to the schools or any other topic of political interest.

Nonetheless, Briggs contends that the Hatch Act as applied to DCPS teachers strikes an inappropriate balance because the government's burden is a heavier one in this case and Congress apparently made a mistake in not exempting DCPS teachers. We disagree on both counts.

First, the government's burden in this case is no greater than it was in *Mitchell* or *Letter Carriers.* Congress need not identify any need to include a particular class of employees within the reach of the Hatch Act. *See Mitchell,* 330 U.S. at 101, 67 S.Ct. 556 (rejecting the argument that administrative and industrial workers under the Hatch Act are subject to different constitutional analyses). Nor is it the case that DCPS teachers possess any enhanced rights under the First Amendment to be political candidates. And the fact that DCPS teachers were once exempted from the Hatch Act is not a reason to afford them any special constitutional protection in this case. Congress is free to change its mind concerning who is excluded from the Hatch Act. *See Kane v. MSPB,* 210 F.3d 1379, 1381 (Fed.Cir.2000) (noting Congress's power to reinstate Hatch Act restrictions over U.S. Postal Service employees after a period of exclusion).

Second, the fact that a contrary choice by Congress, by inclusion of DCPS teachers within the teacher exemption, might have been a wiser choice, as suggested by Briggs's citations to the legislative history of the teacher exemption, does not render unconstitutional the choice Congress made. The Constitution is not necessarily an impediment to ill-advised legislation, even legislation that might have resulted from Congress's mistake or oversight. The *Pickering* balancing test requires only an appropriate balancing of the pertinent interests, not what courts might consider an optimum balance.

Accordingly, we conclude that the government has satisfied its burden and that the Hatch Act establishes an appropriate balance between the interests of the government as an employer and those of DCPS teachers. Therefore, as applied to the teachers, it does not violate the First Amendment.

## C. *Equal Protection*

■ Briggs argues that he has been denied the constitutional guarantee of equal protection. The source of that command with which we are concerned here is the so-called equal protection component of the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *see also Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975))).

Briggs argues that elimination of the teacher exception for DCPS teachers, at the same time Congress maintained the exemption for state and local teachers, constitutes a violation of the equal protection clause. He contends that we should apply strict scrutiny to the issue and that the government must show that the disparate treatment is narrowly tailored to serve a compelling governmental interest. Briggs contends that the government cannot meet that burden, and that there is not even a rational basis supporting the Hatch Act's different treatment of DCPS teachers and state teachers.

The government responds that the distinction drawn by the Hatch Act between DCPS teachers and public school teachers in states and localities neither impinges upon a fundamental right nor is drawn along "suspect" lines, and that rational basis review is therefore appropriate. According to the government, rational bases for the lack of a teacher exemption for DCPS teachers are that DCPS teachers are not similarly situated to state or local teachers because Congress has sole legislative authority over the DCPS, whereas Congress shares control over state and local teachers with state and local governments, which should be given leeway to set their own limits on their employees' political activities.

■ We agree with the government that the level of scrutiny we must apply is rational basis review. Heightened scrutiny is applicable only when a law's classification is drawn along suspect or quasi-suspect lines, such as race, or when the law impinges upon a fundamental right. *See Fed. Communications Comm'n v. Beach Communications,* 508 U.S. 307, 313 (1993); *see also Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). The Act's classification of federal teachers vis-à-vis state or local teachers is clearly not drawn along suspect or quasi-suspect lines. Moreover, as we have indicated above, the Hatch Act's prohibition against running for public office does not impinge upon a fundamental right to free speech. Nor is there a fundamental right to be a political candidate. *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) ("[T]he court has not heretofore attached fundamental status to candidacy as to invoke a rigorous standard of review."); *Clements,* 457 U.S. at 963, 102 S.Ct. 2836 ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" (quoting *Bullock*)). Rational basis review is therefore appropriate. *Accord Alexander v. MSPB,* 165 F.3d 474, 484 (6th Cir.1999) ("The differences in the Hatch Act's treatment of federal and covered state or local agency employees clearly do not involve classifications, either facially or as applied, along 'suspect' lines. Further, although Alexander has repeatedly raised the specter of the First Amendment in this case, the Supreme Court has never recognized a fundamental right to express one's political

views by becoming a candidate for office." (citations omitted)).

■ On a rational basis review, a classification bears a strong presumption of validity, and the burden of persuasion is on a challenger to show the absence of a rational basis. *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096. A rational basis is "any reasonably conceivable state of facts" that support the classification. *Id.* Such facts may be based on "rational speculation unsupported by evidence or empirical data." *Id.*

· The Hatch Act's selective exclusion of some teachers, such as DCPS teachers, from the teacher exception rests on a rational basis. First, Congress has a different relationship to employees of the federal District of Columbia than it does to employees of the states. It has a more direct responsibility for the affairs of the District than it does elsewhere, and it does not share governmental responsibility for the District with the states. In addition, DCPS teachers are not the only teachers subject to the Hatch Act. As pointed out by the government's counsel at oral argument, the federal government employs teachers in a variety of agencies, *e.g.*, the Bureau of Indian Affairs, and, like DCPS teachers, all federal teachers are covered by the Hatch Act and are not beneficiaries of the teacher exception. Second, the Hatch Act's goals—protection of the democratic process and protection of government employees from political forces—are clearly rational. It is certainly reasonable that Congress may have wished to further those goals to the maximum extent possible, without exceptions for any of the teachers over which it has sole authority, whereas, it is also conceivable that Congress may have reasonably chosen to allow the states some leeway to craft their own restrictions on the political candidacies of the teachers whom they employ. Since political elections, even for national offices,

are local, Congress may therefore rationally choose to permit local sovereign entities to allow local school teachers to run for partisan political office, while not permitting DCPS (and other federal) teachers to do so. Thus, there is a rational basis supporting Congress's selective exclusion of federal teachers from the Hatch Act's teacher exception.

The selective reach of the Act's teacher exception rests on a rational basis even if, as Briggs contends, all evidence before Congress during deliberations concerning the exception supported having DCPS teachers within the scope of the exception. In our rational basis inquiry we may look beyond the evidence and empirical data and rationally speculate what might have motivated Congress to make the choice it made. *Id.* We have done so. The concerns outlined above, even though not made of record during Congress's deliberations, are rational concerns that conceivably might have motivated Congress not to exempt DCPS teachers from the Hatch Act. Our review need proceed no deeper in attempts to divine the soundness of Congress's choice. *Id.* ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). Briggs's arguments that Congress has made an improvident choice must be directed to Congress, not to the courts. *Id.* ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." (quoting *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979))).

## CONCLUSION

Because the Hatch Act violates neither the First Amendment nor the equal pro-

tection component of the Fifth Amendment, the Board's decision ordering the removal of Briggs was in accordance with law. Accordingly, we

*AFFIRM.*