# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date: August 13, 2015**

**NO. 34,811**

**EMILY KANE,**

Petitioner-Appellee,

v.

**CITY OF ALBUQUERQUE,**

Respondent-Appellant.

**CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS**
**Beatrice J. Brickhouse, District Judge**

Office of the City Attorney
David Tourek, City Attorney
Rebecca Elizabeth Wardlaw, Assistant City Attorney
Samantha M. Hults, Assistant City Attorney
Albuquerque, NM

Conklin, Woodcock & Ziegler, P.C.
Robin A. Goble
Albuquerque, NM

for Appellant

Cadigan Law Firm, P.C.
Michael J. Cadigan
Kristina Caffrey

for Appellee


Office of the Attorney General
Hector Balderas, Attorney General
Phillip Baca, Assistant Attorney General

for Intervener

**OPINION**

**CHÁVEZ, Justice.**

{1}     Since 1975, we have held that provisions precluding government employees from seeking elective office are constitutionally permissible personnel rules regulating conflicts of interest. *See State ex rel. Gonzales v. Manzagol*, 1975-NMSC-002, ¶¶ 18-19, 87 N.M. 230, 531 P.2d 1203.  These personnel rules act as conditions of employment, and therefore do not constitute added qualifications for elective public office. *See id.* ¶ 13.  Appellee Emily Kane (Kane) ran for elective office while she was employed at the Albuquerque Fire Department (the AFD) as a captain.  Article X, Section 3 of the Charter of the City of Albuquerque (1989) (City Charter), and the City of Albuquerque Personnel Rules and Regulations (City Personnel Rules), Section 311.3 (2001), prohibit city employees from holding elective office.  Kane sought injunctive relief to allow her to hold elective office while retaining her employment with the AFD.  She contends that the employment regulations of the City of Albuquerque (the City) violate (1) the First and Fourth Amendments of the United States Constitution; (2) Article VII, Section 2 of the New Mexico Constitution; and (3) Section 10-7F-9 of the Hazardous Duty Officers' Employer-Employee Relations Act, NMSA 1978, Sections 10-7F-1 to -9 (2010) (the HDOA).  The district court granted Kane the relief she sought.  We reverse.  The City's employment regulations

do not violate the First Amendment because they regulate conflicts of interest, and they are therefore rationally related to the legitimate government purpose of promoting administrative efficiency. Moreover, these regulations do not violate Article VII, Section 2 because they constitute conditions of employment that do not add additional qualifications to elective public office. Finally, the City's employment regulations are not preempted by Section 10-7F-9 because personnel rules touch upon issues of local rather than general concern, and they are therefore within the City's authority to promulgate.

## I.    BACKGROUND

{2}    Kane is a captain in the AFD. During her employment with the AFD, she was nominated as a candidate for the New Mexico House of Representatives. Kane stated that she would neither campaign nor serve as a legislator while on duty. The City objected to Kane's candidacy.

{3}    According to the stipulated facts, "[b]eginning March 26, 2011, the City advised Kane via emails of city policies prohibiting her from running for or holding office and Kane acknowledged receipt that same day." The chief of the AFD also "sent Kane a letter stating that she was not authorized under city law to be a candidate for public office." Moreover, the AFD deputy chief "issued notices of investigation

2

and conducted a pre-discipline interview of Kane relating to her candidacy."

{4}     The City asserts that Kane's candidacy was prohibited by multiple regulations. First, the City Charter provides that "employees of the city are prohibited from holding an elective office of the State of New Mexico or any of its political subdivisions. . . ." City Charter art. X, § 3. Second, the City Personnel Rules provide that "[n]o person shall . . . [b]e a candidate for or hold an elective office of the State of New Mexico or any of its political subdivisions" and that "[n]o person shall engage in political activity that diminishes the integrity, efficiency or discipline of the City service." City Personnel Rules § 311.3.

{5}     Kane sought injunctive relief to enable her to seek elective office. She alleged that "[t]he City demanded that [she] either withdraw her candidacy or resign her job." She asked the district court to restrict "the City from taking any action to require her to withdraw her candidacy." Kane argued that the City's employment regulations violate (1) the First and Fourteenth Amendments of the United States Constitution, (2) Article VII, Section 2 of the New Mexico Constitution, and (3) Section 10-7F-9.

{6}     The district court granted Kane the permanent injunction she sought and awarded her attorney's fees. The City then appealed the district court's decision on the merits and the award of attorney's fees. The New Mexico Court of Appeals

3

certified two related cases to this Court pursuant to Rule 12-606 NMRA. *Kane v. City of Albuquerque*, Nos. 32,343 & 32,683, Certification to Supreme Court (July 8, 2014), which we accepted on August 18, 2014.

## II. DISCUSSION

### A. Whether the City's Prohibitions Against Employers Seeking or Holding Elective Office Violate the First Amendment of the United States Constitution

{7} Kane argues that Article X, Section 3 of the City Charter and City Personnel Rules Section 311.3 violate the First Amendment of the United States Constitution. She claims that these provisions violate her right to candidacy, voters' rights, and the right of "a public employee to speak on matters of public concern." Kane asserts that her right to candidacy and voters' rights are "hybrid and overlapping" such that the constitutional analysis "varies as the restrictions [on these rights] vary." She contends that "[b]ecause the City has severely restricted candidacy rights and because those restrictions impact the fundamental rights of voters, the City's [employment regulations] can survive only if narrowly tailored to advance a compelling state interest." The City characterizes Kane's claim as concerning the right to candidacy and argues that "Kane has no fundamental [c]onstitutional right to seek or hold elective public office," and the City's employment regulations "are rationally related

4

to legitimate governmental interests."

{8}     The appropriate level of scrutiny varies with the analytical approach utilized for each of the three types of rights Kane asserts. Delineating these analytical approaches and their interrelationships is prerequisite to determining the proper level of scrutiny.

**1.     The right to candidacy and the right to vote**

{9}     The right to candidacy and the right to vote are subjected to differing levels of scrutiny. The right to candidacy is not fundamental, *see Bullock v. Carter*, 405 U.S. 134, 142-43 (1972), whereas the right to vote is fundamental. *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983). Restrictions that only impair the right to candidacy are subject to rational basis review. *See, e.g.*, *Brazil-Breashears v. Bilandic*, 53 F.3d 789, 793 (7th Cir. 1995) (subjecting a state supreme court policy prohibiting judicial branch employees from becoming candidates for public office to a rational basis review). On the other hand, restrictions on voters' rights can be subjected to heightened scrutiny. *See Wit v. Berman*, 306 F.3d 1256, 1259 (2d Cir. 2002).

{10}     Although voters' rights and the right to candidacy are subject to differing levels of scrutiny, these rights are not easily separable. *See Bullock*, 405 U.S. at 142-43.

Laws that narrow the field of candidates necessarily limit voter choice, and therefore "always have at least some theoretical, correlative effect on voters." *Id.* at 143. Laws that tend to limit the field of candidates may "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Consequently, regulations limiting the field of candidates can, but do not automatically, compel heightened scrutiny. *Bullock*, 405 U.S. at 142-44. Although voters' rights are fundamental, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788; *accord Grizzle v. Kemp*, 634 F.3d 1314, 1321-22 (11th Cir. 2011) (noting that the right to vote is fundamental, and that restrictions on candidacy imposing severe burdens on First Amendment rights are subject to heightened scrutiny); *Lewis v. Guadagno*, 837 F. Supp. 2d 404, 411 (D.N.J. 2011), *aff'd*, 445 F. App'x 599 (3d Cir. 2011) ("Numerous cases . . . illustrate, either expressly or tacitly, the need for strict scrutiny of restrictions on candidacy only when those restrictions substantially and appreciably impact constitutional rights or basic political freedoms independent of

6

the candidate's ability to run for public office."). Laws limiting the field of candidates cannot circumscribe voters' rights on the basis of "financial status, political opinion, or membership in a protected class." *Lewis*, 837 F. Supp. 2d at 412.

{11}    *Bullock* is instructive about when restrictions limiting the field of candidates trigger heightened scrutiny. *See* 405 U.S. at 142-44. *Bullock* involved a Texas law that required a candidate to pay a filing fee "as a condition to having his [or her] name placed on the ballot in a primary election." *Id.* at 135. This regulation neither placed a condition on the right to vote nor quantitatively diluted the votes that were cast. *Id.* at 143. Nevertheless, the filing fees precluded individuals who lacked either personal wealth or affluent backers from seeking office, even though they may be qualified and enjoy popular support. *Id.* Consequently, voters were "substantially limited in their choice of candidates, [and] there [was] the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community, whose favorites may [have been] unable to pay the large costs required by the Texas system." *Id.* at 144. The Texas electoral system thus created a disparity in voting power based on wealth, which required the Court to review the filing fee system under heightened scrutiny. *Id.*

{12}    By contrast, *Lewis* refused to apply heightened scrutiny in analyzing "New

7

Jersey's durational residency requirement for the office of state senator." *Id.* at 413. The residency requirement only precluded those individuals who did not reside in New Jersey for at least four years from running for office. *Id.* at 412. The residency requirement therefore did not appreciably impact "voters, political parties, or persons with particularized views or minimal wealth" so as to merit heightened scrutiny. *Id.* at 412-13 (discussing *Bullock*, among other cases).

{13} Kane relies on *Anderson* to support her position that we apply heightened scrutiny. In *Anderson*, a statutory filing deadline precluded a presidential candidate from "qualify[ing] for a position on the ballot in Ohio," even though he met "the substantive requirements for having his name placed on the ballot." 460 U.S. at 782. The issue in *Anderson* was "whether Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of [the candidate's] supporters." *Id.* Ohio's early filing deadline required independent presidential candidates to qualify for the November general election ballot by mid-to-late March of the election year. *Id.* at 782-83, 790. By contrast, major political party candidates did not have to qualify for the general election ballot for another five months. *Id.* at 791. Thus, by comparison with supporters of the major political parties, the early filing deadline provided independent voters with less time for deciding which

candidates should qualify for the ballot. *See id.* at 790-93. Moreover, the deadline shrank the pool of independent candidates that was available on the ballot. *See id.* at 790. Consequently, "the inflexibility imposed by the March filing deadline" disadvantaged independent candidates, *id.* at 791, so as to burden "an identifiable segment of Ohio's independent-minded voters." *Id.* at 792.

{14} The *Anderson* Court concluded that this burden was problematic. *See id.* at 792-94. "[T]he primary values protected by the First Amendment [include] a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 794 (internal quotation marks and citation omitted). Regulations limiting the ability of independent voters to associate necessarily undermine their "political effectiveness as a group, [and therefore] reduce diversity and competition in the marketplace of ideas." *Id.* Therefore, laws limiting the field of candidates are unconstitutional when they burden an identifiable segment of voters— such as voters who share a particularized viewpoint, economic status, or associational preference—by limiting these voters' freedom of choice and association. *Id.* at 806 (noting that burdens "placed on the voters' freedom of choice and freedom of association, in an election of nationwide importance, unquestionably outweigh the State's minimal interest in imposing" an early filing deadline for

independent candidates).

{15}     *Anderson* is distinguishable from the case at bar.  First, the City, by precluding City employees from holding elective office, does not impinge on voters' choice by limiting the field of potential candidates, City Charter art. X, § 3 and City Personnel Rules § 311.3, because Kane could retain her position in the AFD or hold elective office.  *See Manzagol*, 1975-NMSC-002, ¶ 13 (noting that a statute precluding a state employee from holding political office did not act as a barrier to political office, but instead jeopardized his position as a public employee).  No legal provision precluded Kane from making this choice.  Therefore, Kane was still "free to run and the people [were] free to choose [her]."  *Signorelli v. Evans*, 637 F.2d 853, 858 (2d Cir. 1980) (noting that where a law provides a prospective candidate with the choice of either running for Congress or retaining his state judgeship, there was "no obstacle between [the candidate] and the ballot" such that the candidate was free to run).  By contrast, the early filing deadline in *Anderson* was not a provision that provided independent candidates with a choice; the deadline either had to be followed or the candidate was barred from the ballot.  460 U.S. at 782.  This lack of choice clearly placed independent candidates, and more importantly, their followers, at a competitive disadvantage during presidential elections because major political party candidates

10

were given a longer period of time in which to enter the presidential race. *Id.* at 790-93. Second, Kane does not allege that the City's employment regulations impact an identifiable group of voters who share a common political affiliation, economic status, viewpoint, or membership in a protected class. Moreover, the record does not reveal any nexus between a preference for electing public employees and an identifiable political preference or any other common identifying factor. Thus, unlike the early filing deadline in *Anderson*, the City's employment regulations do not impinge on the marketplace of ideas. 460 U.S. at 793-94. Therefore, we conclude that the City's regulations do not sufficiently implicate voters' rights so as to trigger heightened scrutiny.

{16}    As other courts have done in similar circumstances, we subject the City's employment regulations to rational basis review. *See, e.g.*, *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 658 (6th Cir. 2008) (applying rational basis review to a statute that "bars the candidacy of an official whose principal employment is in connection with an activity which is financed in whole or in part by the federal government" (internal quotation marks and citation omitted)); *Brazil-Breashears*, 53 F.3d at 793 (concluding that a policy prohibiting state judiciary employees from becoming candidates for public office need only survive rational basis review in part

because "the right to run for office is not a fundamental right"). "It is well-established that a law that results in the termination of a public employee who runs for elective office does not need to survive heightened scrutiny to be constitutional." *Molina-Crespo*, 547 F.3d at 657.

{17} Under rational basis review, a law "need only be rationally related to a legitimate government purpose." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). We first consider whether the City's employment regulations serve a legitimate government purpose. To prevail, the City need only establish "the *existence* of a conceivable rational basis" for its regulations. *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1547 (11th Cir. 1994). The City need not prove that a "basis was actually considered by [a] legislative body." *Id.* The standard of review that the district court applied to the City's employment regulations is unclear, but the district court nevertheless found that "[t]he City does not have a valid interest in preventing City employees from running for and holding non-City elected office." We disagree and hold that the City has multiple legitimate interests in promulgating its employment regulations.

{18} First, the City has an interest in minimizing, if not eliminating, conflicting demands on public employees. Forty years ago, this Court noted in *Manzagol* that

the duties of political office are almost certain to impose upon state employees conflicting demands in terms of time, energy, and loyalty. 1975-NMSC-002, ¶ 18. *Manzagol* concerned a petitioner who was both "a resident and duly qualified elector of the City and County of Santa Fe and an employee of the State of New Mexico as a Water Resource Assistant in the Office of the Engineer." *Id.* ¶ 2. A statute precluded him from serving in political office. *Id.* ¶ 13. We observed in *Manzagol* that the petitioner's service as a political officer "may very well [have] place[d] him in a position of conflict with his state employment in regard to water rights claimed by the City of Santa Fe." *Id.* ¶ 18. The statute, in minimizing the risk of conflicting interests, was therefore a constitutionally "reasonable standard or restriction upon [petitioner's] employment by the State." *Id.* ¶ 19. Similarly, Kane's service in the New Mexico Legislature may place her in a position of conflict with her City employment in regard to promulgating state laws affecting the AFD.

{19} Second, the City has a legitimate interest in limiting the perception of partisan influence among its employees. *See Molina-Crespo*, 547 F.3d at 658. For example, Kane's identification with a certain political party could conceivably put pressure, either actual or perceived, on her subordinates "to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their

13

own beliefs." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers AFL-CIO*, 413 U.S. 548, 566 (1973).

{20} Kane erroneously contends that even if the City's employment regulations further legitimate governmental purposes as they applied to her, the City's preclusion of employees from seeking both partisan and non-partisan elective offices is unconstitutionally overbroad. Under rational basis review, we do not consider situations such as the claims of candidates seeking non-partisan office that are not before the Court. *Manzagol*, 1975-NMSC-002, ¶ 16 ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." (internal quotation marks and citations omitted)); *accord Clements v. Fashing*, 457 U.S. 957, 960, 972 n.6 (1982) (noting that a litigant contesting a resign-to-run statute "may not challenge the provision's application to him [or her] on the grounds that the provision might be unconstitutional as applied to a class of officeholders not before the Court").

{21} Having established that the City has legitimate interests in preventing conflicting demands on its public servants and avoiding the perception of partisanship

within the City administration, we turn to whether the City's employment regulations are rationally related to these interests. The regulations under attack obviously eliminate the risk that the duties of elective office would impose conflicting demands on City employees; the City's regulations are therefore a constitutional method of eliminating conflicting interests among public employees. *Manzagol*, 1975-NMSC-002, ¶¶ 18-19. The City's employment regulations also clearly preclude the possibility that employees would feel pressure to vote or campaign for superiors seeking elective office, and they are therefore rationally related to the governmental purpose of removing either "actual or apparent partisan influence." *See Molina-Crespo*, 547 F.3d at 658.

{22}   We conclude that the City's employment regulations are rationally related to legitimate government purposes and hold that these provisions do not unconstitutionally circumscribe either the right to candidacy or voters' rights. We next address whether the City unconstitutionally limited Kane's right to speak on matters of public concern.

**2.      The right to speak on matters of public concern**

{23}   Kane argues that her right to engage in "pure political speech" was infringed because her right to speak on matters of public concern was harmed when the City

15

threatened her with disciplinary action after she notified her superiors that she was seeking elective office. Our analysis therefore shifts from primarily determining the potentiality of harm to voters and the marketplace of ideas[1] to evaluating the harm done to Kane, as a speaker. Utilizing the rationale in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563, 568-69 (1968), we determine the constitutionality of restrictions on the right to speak via a balancing test. We must decide "whether the speech at issue addresses a matter of public concern and if so, decid[e] the proper balance between the employee's constitutional rights and the State's interest as an employer in promoting efficient provision of public services." *Deemer v. Durell*, 110 F. Supp. 2d 1177, 1181 (S.D. Iowa 1999).

{24}   Most federal circuits have concluded that candidacy for office is a matter of public concern. *See, e.g.*, *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (concluding that a candidate's "political speech—his [or her] candidacy for office—undoubtedly relates to matters of public concern"); *Click v. Copeland*, 970

---

[1]When *Anderson* analyzed a barrier to ballot access, the United States Supreme Court began its analysis "by noting that [its] primary concern [was] not the interest of [the] candidate . . . , but rather, the interests of the voters who chose to associate together to express their support for [that candidate] and the views he espoused." 460 U.S. at 806.

F.2d 106, 112 (5th Cir. 1992) (concluding that "running for elected office[] addresse[s] matters of public concern"); *see generally* Ross Staine, *First Amendment Protection for Political Candidacy of Public Employees*, 66 SMU L. Rev. 461 (2013) (surveying cases concerning the right to speak on matters of public concern). A minority position holds that the mere fact of candidacy is not a matter of public concern. *See, e.g.*, *Carver v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997) (holding that where an employee "was fired [solely] for announcing her intention to take her boss's office," the employee did not speak on a matter of public concern), *limitation of holding recognized by Greenwell v. Parsley*, 541 F.3d 401, 403-04 (6th Cir. 2008). For speech to be considered a matter of public concern, this minority position requires that potential candidates express their political viewpoints. *Murphy v. Cockrell*, 505 F.3d 446, 451 (6th Cir. 2007) (discussing *Carver* and distinguishing "cases in which candidates had been singled out or treated differently based on their political viewpoints or expressions, noting that [the candidate in *Carver*] was dismissed solely based on the fact of his candidacy, not his political views").

{25}     Kane relies on *Murphy*, a minority position case, and argues that "the City did not threaten disciplinary action because of the mere fact of Ms. Kane's *candidacy*, but did so due to the *manner in which* Ms. Kane campaigned." We therefore determine

17

whether under *Murphy*, Kane faced adverse employment action due to expressing her political viewpoints.

{26}    In *Murphy*, a Democratic subordinate ran against a Republican supervisor for an elective office. *Id.* at 448. During the campaign, the subordinate "attacked [the supervisor's] perceived inexperience" for the office. *Id.* When the supervisor prevailed, the subordinate was discharged. *Id.* at 449. *Murphy* held that the subordinate's campaign speech was protected under the First Amendment and employed the balancing prong of the *Pickering* test. *Murphy*, 505 F.3d at 452.

{27}    Kane attempts to analogize her situation to the situation in *Murphy*. She alleges that unlike previous AFD employees who sought elective office, she notified her superiors of her intention to run; she was threatened with potential disciplinary treatment because she chose to disregard the City's employment regulations; and other City employees were not disciplined for their candidacies because they did not notify the City of their political aspirations. Kane presumably is contending that the City's threat of discipline was unconstitutional under *Murphy* because the threat amounted to an attack on the expression of her political viewpoints, since the threat followed from Kane's notification of her candidacy.

{28}    *Murphy* is distinguishable from the case at bar. The subordinate in *Murphy*

18

was not discharged pursuant to a personnel regulation that precluded her candidacy, *see generally* 505 F.3d 446, but was terminated for campaign speech that reflected negatively on her supervisor. *Id.* at 451-52. Thus, the supervisor in *Murphy* had discretion in discharging the subordinate. Consequently, the supervisor, in choosing to discharge the subordinate on the basis of campaign speech, effectively politicized a personnel decision[2] in a manner that circumscribed political expression beyond that mandated by law. In contrast, Kane was threatened with discipline pursuant to the City Personnel Rules. This threat of discipline was therefore not an arbitrary attempt to limit political expression, but instead was an attempt to enforce existing employment regulations. Morever, unlike the subordinate in *Murphy*, Kane does not allege facts to suggest that she was attacked for expressing a political viewpoint. For example, she did not attack the credentials of a candidate for public office. She merely alleges that she was attacked for notifying her superiors of her intention to run

---

[2]We note that the politicization of personnel decisions can damage employee morale and can be harmful to government efficiency. *See Phillips v. City of Dallas*, 781 F.3d 772, 780 (5th Cir. 2015); *Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1314-15 (Fed. Cir. 2003). By contrast, employment regulations precluding government employees from holding or seeking elective office prevent the politicization of personnel decisions. *See Phillips*, 781 F.3d at 780; *Briggs*, 331 F.3d at 1314-15. Thus, whereas *Murphy* involved the politicization of a personnel decision, 505 F.3d at 451-52, in the case at bar, the City was merely attempting to implement provisions that preclude politicization within the government workforce. Kane's reliance on *Murphy* is therefore misplaced.

19

for elective office. Kane essentially alleges that she was attacked for announcing her candidacy. However, "the mere fact of candidacy [is] not constitutionally protected, [whereas] the expression of one's political belief still [falls] under the ambit of the First Amendment." 503 F.3d at 451. Therefore, under *Murphy*, Kane's right to speak on a matter of public concern was not violated because the mere fact of candidacy is not a matter of public concern.

{29}     Moreover, even if we were to decide that the mere fact of candidacy was a matter of public concern, Kane would still not prevail. Laws that preclude government employees from a wide range of political activities have been upheld as constitutional; constitutionally prohibited activities include "raising money for, publicly endorsing, or campaigning for political candidates; serving as an officer of a political club; participating as a delegate in a political convention or running for office in a political party; and writing letters on political subjects to newspapers." *Phillips v. City of Dallas*, 781 F.3d 772, 780 (5th Cir. 2015). These laws are justifiable because political activity may become a basis for the preferential treatment of employees, damage morale, and therefore impair government efficiency. *See id.*; *Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1314-15 (Fed. Cir. 2003). Thus, even when the mere fact of candidacy is considered a matter of a public concern,

employment regulations prohibiting employees from running for elective office are constitutional. *See, e.g.*, *Phillips*, 781 F.3d at 774, 783 (upholding the constitutionality of a municipal regulation that "prevented city employees from seeking office in any county overlapping the city").

{30} In conclusion, Kane's right to speak on matters of public concern was not violated. Having already held that the City's employment regulations do not violate either candidates' or voters' rights, we will not hold unconstitutional the City's attempts to apply its employment regulations by threatening non-complying employees with discipline.

**B. The City's Employment Provisions Do Not Violate Article VII, Section 2 of the New Mexico Constitution Because They Are Permissible Qualifications and Standards for Holding Appointive Public Positions Under Article VII, Section 2(B)**

{31} Kane next argues that the City's employment regulations add a qualification for holding elective public office—that the citizen not be a City employee—in violation of Article VII, Section 2(A). The City argues that the regulations do not impose additional eligibility requirements for elective public office in conflict with those set by the New Mexico Constitution, but rather constitute permissible qualifications and standards for employment in an appointive position with the City. *See* N.M. Const. art. VII, § 2(B). The parties differ in their interpretations of Section

21

VII, Section 2 which provides, in relevant part:

> A. Every citizen of the United States who is a legal resident of the state and is a qualified elector therein, shall be qualified to hold any elective public office except as otherwise provided in this constitution.

> B. The legislature may provide by law for such qualifications and standards as may be necessary for holding an appointive position by any public officer or employee.

{32} Whose interpretation is correct necessarily turns on whether the City Charter and City Personnel Rules prohibiting city employees from simultaneously running for elective office or holding elective office are a qualification for elective office or a qualification and standard for holding an appointive public position. Article VII, Section 2(A) prohibits any qualifications for elective public office beyond those enumerated in the New Mexico Constitution, *see Cottrell v. Santillanes*, 1995-NMCA-090, ¶¶ 7-8, 120 N.M. 367, 901 P.2d 785, while Article II, Section 2(B) provides legislative authority to promulgate qualifications and standards for holding appointive positions by public officers or employees. *Manzagol*, 1975-NMSC-002, ¶ 13.

{33} The legislative history of Article VII, Section 2 indicates that there is a distinction between qualifications for elective public office and qualifications and standards for appointive positions. Prior to 1961, the 1921 version of Article VII,

22

Section 2 broadly applied to any public office; it explicitly provided that "[e]very citizen of the United States who is a legal resident of the state and is a qualified elector therein, shall be qualified to hold any public office in the state except as otherwise provided in this constitution." N.M. Const. art. VII, § 2 (as amended September 20, 1921). In 1961 New Mexico legislators, due to the breadth of the 1921 version of Article VII, Section 2, sought voters' adoption of an amendment to Article VII, Section 2 to assure the constitutionality of the Personnel Act, NMSA 1953, §§ 5-4-28 to -46 (1961) (now recodified as NMSA 1978, §§ 10-9-1 to -25 (1961, as amended through 2014)), which established a system of personnel administration in state government. *See* 1961 N.M. Laws, ch. 240, §§ 1-21.

{34}     Article VII, Section 2 was amended to divide the section into three subsections effective September 19, 1961. Subsection A inserted "elective" before "public office" and deleted "in the state" thereafter; Subsection B inserted new material addressing "an appointive position by any public officer or employee"; and Subsection C is not relevant to this case. Thus, the 1961 amendment to Article VII, Sections 2(A) and (B) provided that:

> A.     Every citizen of the United States who is a legal resident of the state and is a qualified elector therein, shall be qualified to hold any elective public office except as otherwise provided in this Constitution.

23

**B.** The legislature may provide by law for such qualifications and standards as may be necessary for holding an appointive position by any public officer or employee.[3]

{35} Subsection A concerns qualifications for "elective public office," N.M. Const. art. VII, § 2(A), and Subsection B concerns "qualifications and standards . . . for holding an appointive position by any public officer or employee," N.M. Const. art. VII, § 2(B). Elective public offices are distinguishable from appointive positions, which is why they are treated differently in our case law. According to *Black's Law Dictionary* at 517-18 (6th ed. 1990), an election is defined as "[a]n expression of choice by the voters of a public body politic," whereas the term "appoint" is used "where exclusive power and authority is given to one person, officer, or body to name persons to hold certain offices," *id.* at 99. Essentially, elected public offices are chosen by voters, while appointed offices are generally designated by one person, officer, or body with the exclusive power and authority to make such a designation for a given public office. *See id.* at 99. If a position is not an elective public office, Article VII, Section 2(A) is not implicated. *Daniels v. Watson*, 1966-NMSC-011, ¶¶ 5-6, 75 N.M. 661, 410 P.2d 193 (noting that Article VII, Section 2(A) had no

_____

[3]A subsequent 1973 amendment only affected Subsection C of Article VII, Section 2 of the New Mexico Constitution. Therefore, the 1961 amendments to Article VII, Section 2 reflect Subsections A and B in their current form.

application to qualifications and standards for member positions on the board of a junior college district because those positions were "appointive rather than elective").

{36} The 1961 amendment indicates that qualifications for elective public office can only be promulgated through the New Mexico Constitution. N.M. Const. art VII, § 2(A). By contrast, Article VII, Section 2(B)[4] grants the Legislature authority to promulgate qualifications and standards for appointive positions such as the employment conditions promulgated in the Personnel Act. *Manzagol*, 1975-NMSC-002, ¶ 13.

{37} When the Legislature amended the Personnel Act in 1963 to conform to the 1961 amendment of Article VII, Section 2, it provided that

> [t]he purpose of the Personnel Act is to establish for New Mexico a system of personnel administration based solely on qualification and ability, which will provide greater economy and efficiency in the management of state affairs. The Personnel Act is enacted under and pursuant to the provisions of article 7, section 2 of the Constitution of New Mexico, as amended.

NMSA 1953, § 5-4-29 (1963) (citation omitted). The last sentence of Section 5-4-29 was added in 1963 to reflect that the Legislature was specifically authorized to enact

---

[4]The Personnel Act was passed prior to September 19, 1961, when Article VII, Section 2(B) was promulgated. *See* 1961 N.M. Laws, ch. 240, §§ 1-21. This chronology suggests that the Legislature wanted to ensure that the original form of Article VII, Section 2 did not render the Personnel Act unconstitutional.

25

the entire Personnel Act under Article VII, Section 2, as amended. The stated purpose of the Personnel Act indicates the Legislature believed that in providing qualifications and standards for appointive positions, the entire Personnel Act was in jeopardy of being declared unconstitutional under the 1921 version of Article VII, Section 2. Consequently, the Personnel Act's statement of purpose recognizes that Article VII, Section 2(B) conveys authority to create qualifications and standards for appointive public positions, which includes employee positions.

{38}    The District Attorney Personnel and Compensation Act, NMSA 1978, §§ 36-1A-1 to -15 (1991, as amended through 1999), similarly concerns a system of personnel administration for district attorneys "based solely on qualification and ability [and] is enacted pursuant to the provisions of Article 7, Section 2 of the constitution of New Mexico." Section 36-1A-2. Importantly, the District Attorney Personnel and Compensation Act does not contain any provisions preventing district attorney personnel from seeking or holding elective public office. *See generally* §§ 36-1A-1 to -15. The omission of language concerning the seeking or holding of elective office constitutes additional evidence that Article VII, Section 2(B) was believed by the Legislature to be necessary to ensure the constitutionality of legislation that addresses public employee qualifications and standards. There is no

26

indication of legislative concern over qualifications for elective public office.

{39}     We must next determine whether the City Charter and employee regulations are impermissible "qualifi[cations] to hold any elective public office" within the meaning of Article VII, Section 2(A) or are permissible "qualifications and standards . . . for holding an appointive position by any public officer or employee" within the meaning of Article VII, Section 2(B).  The *Manzagol* court held that NMSA 1953, Section 5-4-42(B) (Vol. 2, 2nd Repl., Part 1, 1974) of the Personnel Act—which like the City's employment regulations prohibited state employees from holding political office—was not a qualification for holding elective public office, and that Article VII, Section 2(A) was not implicated by the Personnel Act.  *See* 1975-NMSC-002, ¶ 13.

> No effort is being made [by Section 5-4-42(B)] to impose any restriction upon the elective public office which Petitioner holds or upon him as the holder of that office.  It is his appointive position as a "public officer or employee" which is in danger by his persistent action in holding a "political office."

*Manzagol*, 1975-NMSC-002, ¶ 13.

{40}     Legal precedent supports *Manzagol*'s distinction between impermissible, additional qualifications for elective public office and permissible employment regulations for appointive positions.  In New Mexico, a qualified individual is one who is eligible for elective public office.  *Bd. of Comm'rs of Guadalupe Cty. v. Dist.*

27

*Ct. of Fourth Jud. Dist.*, 1924-NMSC-009, ¶ 29, 29 N.M. 244, 223 P. 516. Article VII, Section 2(A) only concerns the class of persons eligible to be chosen for elective public office; it does not concern the separate employment regulations this class of persons may have. Consequently, "[t]he requirement that the holder of [an appointive] public office must tender his [or her] resignation upon becoming a candidate for another office, or that his [or her] filing for another office would work a resignation ipso facto, does not prescribe additional qualifications for the [elective public] office." *Mulholland v. Ayers*, 99 P.2d 234, 239 (Mont. 1940). This is because "[a] person may possess the requisite qualifications or may be eligible [for] many different offices." *Id.* "The legal requirement, however, that he [or she] may not hold more than one [public office] at a time does not affect his [or her] eligibility to hold them all." *Id.*

{41}    Under *Manzagol*, the City's employee regulations neither preclude Kane from holding elective office, City Charter art. X, § 3, nor from seeking elective office, City Personnel Rules § 311.3. As such, the City's employee regulations are not qualifications within the meaning of Article VII, Section 2(A). 1975-NMSC-002, ¶ 13. Instead, the City's employee regulations are permissible "qualifications and standards . . . for holding an appointive position" within the meaning of Article VII,

Section 2(B). Kane's appointive position as a firefighter did not render her ineligible for the elective public office of a state legislator; instead, her campaign for and service as a state legislator precluded her from continuing her appointive position as a firefighter. As in *Manzagol*, we conclude that in preventing Kane from retaining her appointive position as a firefighter while campaigning for or serving in elective public office, the City's employment regulations are permissible "qualifications and standards . . . for holding an appointive position" under the meaning of Article VII, Section 2(B).

{42}   Nonetheless, Kane relies on *Cottrell* to argue that the City's employment regulations are impermissible qualifications for elective public office. *Cottrell* concerned a municipal charter that required "candidates for the Albuquerque City Council not [to] have served two prior terms." 1995-NMCA-090, ¶ 16. The issue was whether this provision constituted an impermissible qualification on elective public office in contravention of Article VII, Section 2(A). *Cottrell*, 1995-NMCA-090, ¶¶ 6-8. The court in *Cottrell* read Article VII, Section 2(A) in conjunction with Article V, Section 13 of the New Mexico Constitution[5] and

[5]Article V, Section 13 of the New Mexico Constitution provides that "[a]ll district and municipal officers, county commissioners, school board members and municipal governing body members shall be residents of the political subdivision or district from which they are elected or for which they are appointed."

29

concluded that under the New Mexico Constitution, "any citizen who is a qualified voter can hold any municipal elected office subject only to the residency requirement." 1995-NMCA-090, ¶ 7. Because the term limit provision prevented qualified voters from holding elective office, the provision constituted a qualification on elective public office. *Id.* ¶¶ 7-8. This additional qualification was impermissible because "the sole means of adopting additional qualifications [for elective public office] is by constitutional amendment." *Id.* ¶ 8. Not even the Home Rule Amendment afforded municipalities the power to impose additional qualifications on elective office. *Id.* ¶ 9. *Cottrell* therefore held that Article VII, Section 2 "preempts a home rule municipality's power to adopt additional qualifications for elected office within the state beyond those set forth in [the New Mexico] Constitution." *Cottrell*, 1995-NMCA-090, ¶ 1.

{43} Kane contends that her situation is analogous to the situation in *Cottrell*. We disagree. *Cottrell* properly stands for the proposition that under Article VII, Section 2(A), only amendments to the Constitution can permissibly add qualifications to elective public office. 1995-NMCA-090, ¶ 8. However, this case is clearly distinguishable. We have already established that the City's employment provisions do not constitute qualifications for elective public office; therefore, Article VII,

30

Section 2(A) is not implicated. Indeed, *Cottrell* recognized, albeit in dicta, that Article X, Section 3 of the City Charter merely regulates conflicts of interest concerning city employees and does not add qualifications for elective public office. 1995-NMCA-090, ¶ 15. Thus, *Cottrell*'s holding concerning unconstitutional additional qualifications to elective public office "in no way affects" the constitutionality of Article X, Section 3 of the City Charter. 1995-NMCA-090, ¶ 15.

{44}    We next determine whether the City has the authority to promulgate qualifications and standards within the meaning of Article VII, Section 2(B). The *Manzagol* court recognized that under Article VII, Section 2(B), legislative authority exists to create the conditions of employment that preclude a state employee from holding an elected public office. 1975-NMSC-002, ¶ 13.

> Clearly, the Legislature had the constitutional power under art. 7, § 2, subd. B . . . to enact 5-4-42(B) . . . and to thereby provide, as a qualification or standard for his [or her] continued employment by the State in a position covered by the . . . Personnel Act, that he [or she] not hold "political office."

*Manzagol*, 1975-NMSC-002, ¶ 13. However, *Manzagol* does not specifically address whether municipalities may adopt regulations addressing personnel administration. We hold that under NMSA 1978, Section 3-13-4 (1965), municipalities have been delegated the legislative authority articulated in Article VII, Section 2(B) to enact

31

qualifications and standards for appointive employee positions.

{45} In 1994, the Court of Appeals noted that Section 3-13-4 authorized municipalities to create "merit system ordinances that apply to employees." *Webb v. Vill. of Ruidoso Downs*, 1994-NMCA-026, ¶ 9, 117 N.M. 253, 871 P.2d 17. Under Section 3-13-4(A), municipalities may promulgate "reasonable restrictions or prohibitions on political activities which are deemed detrimental to" municipal merit systems. Consequently, pursuant to Section 3-13-4(A), municipalities have the legislative authority to impose restrictions on political activities that under *Manzagol* are qualifications and standards within the meaning of Article VII, Section 2(B). 1975-NMSC-002, ¶ 13. As an aside, we note that employee regulations circumscribing the political activities of public employees promote important governmental interests, such as

> (1) encouraging public officials to devote themselves exclusively to the duties of their office, (2) reducing the possibility of public subsidies for officials merely using their office as a stepping stone, (3) preventing abuse of office before and after election, and (4) protecting the expectations of the electorate voting a candidate into [public] office.

*Fasi v. Cayetano*, 752 F. Supp. 942, 949 (D. Haw. 1990).

{46} A municipality is defined as "any incorporated city, town or village." NMSA 1978, § 3-1-2(G) (1993). The parties do not dispute that the City is a municipal

corporation. Therefore, the City has the authority under Section 3-13-4(A) to promulgate qualifications and standards for its employees, including restrictions on political activities. In this case, the parties do not dispute that Kane is an employee of the City. Consequently, the City's employment regulations prohibiting Kane from seeking or holding elective public office were permissibly promulgated under Article VII, Section 2(B) of the New Mexico Constitution and Section 3-13-4(A).

**C.    Whether Section 10-7F-9 Preempts the City's Prohibition Against Municipal Employees Seeking Elective Office**

{47}    Finally, Kane argues that Article X, Section 3 of the City Charter is not a valid exercise of the City's municipal powers because it is preempted by Section 10-7F-9 of the HDOA. Section 10-7F-9 provides that "[a] hazardous duty officer shall not be prohibited by an employer from engaging in any political activity when the officer is off duty, except as otherwise provided by law." According to Kane, although the HDOA contemplates the possibility that other laws may circumscribe a hazardous duty officer's political activities, Article X, Section 3 of the City Charter is not a valid law that limits her political activities. In determining the permissibility of Article X, Section 3 of the City Charter, we first provide an overview of city charters before applying the preemption test from *State ex rel. Haynes v. Bonem*, 1992-NMSC-062, ¶ 14, 114 N.M. 627, 845 P.2d 150.

33

{48} In 1970, New Mexico adopted a state constitutional amendment that "establishes the right of the citizens of a municipality to adopt a home rule charter." *Id.* ¶ 11 (citing Article X, Section 6). Municipalities that adopt home rule charters "may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. Const. art. X, § 6(D). "Thus, home rule municipalities do not look to the legislature for a grant of power to legislate, but only look to statutes to determine if any express limitations have been placed on that power." *Haynes*, 1992-NMSC-062, ¶ 11. By contrast, "[t]hose municipalities that choose not to adopt a home rule charter must still depend on the legislature for their power to act." *Id.* Municipal home rule was created to "enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent, in their own way." *Id.* ¶ 12 (internal quotation marks and citations omitted); *see also* N.M. Const. art. X, § 6(E) (noting that the purpose of enabling home rule "is to provide for maximum local self-government [such that a] liberal construction shall be given to the powers of municipalities").

{49} Determining whether Section 10-7F-9 preempts Article X, Section 3 of the City Charter requires a two-step analysis. We initially determine whether Section 10-7F-9 is a general law. *Haynes*, 1992-NMSC-062, ¶ 14. If we determine that Section 10-

34

7F-9 is a general law, we then determine whether the provision expressly denies a home rule municipality the authority to prohibit its employees from seeking elective office. *See Haynes*, 1992-NMSC-062, ¶ 14.

{50}	Kane argues that Article X, Section 3 of the City Charter is not a valid exercise of the City's legislative authority. Under Kane's interpretation of Section 10-7F-9, only the Legislature can deviate from Section 10-7F-9's default position of protecting firefighters' political activities. According to Kane, Section 10-7F-9 is a general law. She then contends that this general law deprives the City of the power to circumscribe hazardous duty officers' political activities because the Legislature evinced an intent to uniformly regulate employer-employee relations, at least with respect to hazardous duty officers.

**1.	Whether Section 10-7F-9 is a general law**

{51}	A general law is "a law that applies generally throughout the state *and* is of statewide concern as contrasted to 'local' or 'municipal' law." *Haynes*, 1992-NMSC-062, ¶ 17.

> In defining the term 'general law' as used in the home rule amendment, this Court . . . attempt[ed] to impart the basic notion, applied across the country, that in order for a statute to override an enactment of a home rule municipality, the statute must relate to a matter of statewide concern.

35

*Id.* For example, *City of Albuquerque v. New Mexico Public Service Commission*, 1993-NMSC-021, ¶ 24, 115 N.M. 521, 854 P.2d 348 held that utility rate-making "is a matter of statewide rather than local concern . . . because a proposed service rate for one municipality can affect rates to other municipalities in the state." By contrast, *Haynes* held that state provisions setting the number of municipal commissioners did not touch upon a matter of general concern, and allowed a municipality to "provide for a different number [of commissioners] as set out in its charter," 1992-NMSC-062, ¶ 1, because "the number of commissioners in the governing body[] is precisely the sort of matter intended to fall within the decisionmaking power of a home rule municipality." *Id.* ¶ 21. The number of commissioners a municipality has "is predominantly, if not entirely, of interest to the citizens of the" municipality for which these commissioners serve. *Id.*

{52} We hold that Section 10-7F-9 is not a general law. The regulation of government employees' activities under the First Amendment of the United States Constitution touches upon issues of local, not statewide, concern. Municipalities may provide for the convenience of their inhabitants. NMSA 1978, § 3-17-1(B) (1993) ("The governing body of a municipality may adopt ordinances or resolutions not inconsistent with the laws of New Mexico for the purpose of . . . providing for the

36

safety, preserving the health, promoting the prosperity and improving the morals, order, comfort and convenience of the municipality and its inhabitants."). Regulating the First Amendment activities of government employees can further the efficiency of governmental operations. *See Briggs*, 331 F.3d at 1313-15 (noting that determining the permissibility of restrictions on the First Amendment activities of government employees involves a balancing of governmental efficiency interests against employee rights and indicating that First Amendment activities may, in some circumstances, impair efficiency). "[I]ncreased efficiency of operation may reasonably be expected to promote the service, accommodation, and convenience of the public." *Lyons Transp. Co. v. Pa. Pub. Util. Comm'n*, 61 A.2d 362, 365 (Pa. Super. Ct. 1948). Thus, municipalities have an interest in promoting the convenience of their inhabitants, and regulations of municipal employees' First Amendment activities further the convenience of such inhabitants. Because Section 10-7F-9 touches upon the regulation of municipal employees' First Amendment activities, we conclude that Section 10-7F-9 is not a general law regulating a topic of statewide concern.

{53}     Kane contends that the employment relationships of hazardous duty officers are matters of general concern because "[a]s the members of the public served every

37

day by hazardous duty officers, New Mexicans . . . deserve to know that the relationship between these heroes as their employers is as respectful as possible." This argument is without merit. Under the facts in *Haynes*, it could have been said that all citizens statewide have an interest in the form of their local government. However, this does not mean that a state statute implicating local forms of government raised issues of statewide concern because the constituencies of local governments have the most interest in their respective forms of local government. *Haynes*, 1992-NMSC-062, ¶ 21. It also can be said that all citizens have an interest in how hazardous duty officers are regulated. However, employment regulations concerning hazardous duty officers touch upon the local interests of the citizens such officers serve, and not the State's broader interests. *See McGee v. Civil Serv. Bd. of City of Portland*, 154 P.3d 135, 139 (Or. Ct. App. 2007) ("[T]he administrative machinery by which the employment and discharge of city fire[fighters] is to be determined is a matter of local concern." (alteration in original) (internal quotation marks and citation omitted)).

{54}     We conclude that Section 10-7F-9 does not preempt the City's employment regulations because it is not a general law. However, even if Section 10-7F-9 were a general law, it would not preempt the City's employment regulations because the

restrictions do not conflict with Section 10-7F-9.

**2. Whether Section 10-7F-9 expressly denies the City the power to prohibit its employees from seeking elective office**

{55} If a statute is a general law, we next inquire whether the provision expressly denies a home rule municipality the right to prohibit its employees from seeking elective office. *Haynes*, 1992-NMSC-062, ¶ 14. "[A]ny New Mexico law that clearly intends to preempt a governmental area [qualifies as an express denial] without necessarily stating that affected municipalities must comply and cannot operate to the contrary." *Id.* ¶ 22 (internal quotation marks and citation omitted). Kane asserts that the City's employment regulations are preempted by Section 10-7F-9. Kane reasons that the HDOA, through enumerating various rights that are guaranteed to hazardous duty officers, evinces an intent by the Legislature to address New Mexico municipalities' "record of abusing the[] rights of hazardous duty officers," or to at least prevent such abuse.

{56} We disagree. The HDOA contains no requirement for a uniform law concerning the proscription of hazardous duty officers' political activities. *See* §§ 10-7F-1 to -9. More importantly, although Section 10-7F-9 states that "[a] hazardous duty officer shall not be prohibited by an employer from engaging in any political activity when the officer is off duty," the provision also provides the restriction

39

"except as otherwise provided by law." This indicates that the HDOA contemplates that regulations of hazardous duty officers' political activities will not be uniform.

{57} We conclude that the City correctly argues that "Article X, Section 3 of the City's home rule Charter falls within the HDOA's 'except as otherwise provided by law' exception" such that Section 10-7F-9 does not preempt municipal employment regulations. The phrase "except as otherwise provided by law" should be read broadly so as to include municipal laws. In *Republican Party of New Mexico v. New Mexico Taxation & Revenue Dep't*, we characterized the phrase "as otherwise provided by law" as a catch-all term that includes statutes, regulations, and constitutional provisions. *See* 2012-NMSC-026, ¶ 13, 283 P.3d 853 (internal quotation marks and citation omitted). Moreover, municipal enactments are considered law. *City of Aztec v. Gurule*, 2010-NMSC-006, ¶ 16, 147 N.M. 693, 228 P.3d 477 ("[M]unicipal ordinances are law and may be judicially noticed as such."). Finally, we have already concluded that under Section 3-13-4(A), municipalities have been delegated the legislative authority to promulgate qualifications and standards for appointed employees, including firefighters. We therefore hold that Section 10-7F-9 does not preempt the City's employment regulations as applied to hazardous duty officers.

40

## D. Whether Kane Is Entitled to Attorney's Fees

{58} New Mexico generally follows the American rule, which provides that each party should bear its own attorney's fees unless a statute, court rule, or contractual agreement authorizes an award of attorney's fees. *See Paz v. Tijerina*, 2007-NMCA-109, ¶ 9, 142 N.M. 391, 165 P.3d 1167. The relevant statutory exception to the application of the American rule in this case is the Civil Rights Act, 42 U.S.C. § 1988(b) (2000). In any action or proceeding to enforce a provision of Sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, Title IX of Public Law 92-318, or Title VI of the Civil Rights Act of 1964, among others, the Court, in its discretion, "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

{59} Pursuant to 42 U.S.C. § 1988 and NMSA 1978, Section 44-6-11 (1975), the district court awarded Kane $7,644.50 in attorney's fees and $242.70 in costs, with interest accruing on those amounts at a rate of 8.75 percent per annum from the date of entry of the order. The City argues that Kane cannot recover attorney's fees pursuant to 42 U.S.C. § 1988 if this Court reverses the district court's ruling on Kane's constitutional claims. Kane argues that the City overstates the burden of proving that one is a prevailing party by noting that the broad language in 42 U.S.C.

41

§ 1988 does not explicitly state that a party must also prevail on appeal.

{60}    We disagree with Kane's position. When a case is actually litigated and a plaintiff does not win on any significant issue, that plaintiff is not a prevailing party within the meaning of 42 U.S.C. § 1988. *Pearson v. Fair*, 935 F.2d 401, 415 (1st Cir. 1991) (citing *Langton v. Johnston*, 928 F.2d 1206, 1224 (1st Cir. 1991)). A "plaintiff must be able to point to a resolution of the dispute which change[d] the legal relationship between itself and the defendant." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989). "A plaintiff who achieves a transient victory at the threshold of an action can gain no award under [42 U.S.C. § 1988] if, at the end of the litigation, [his or] her initial success is undone and [he or] she leaves the courthouse emptyhanded." *Sole v. Wyner*, 551 U.S. 74, 78 (2007). We also note that "[a] plaintiff who prevails on one or more state claims but loses on all federal claims will not be eligible for an attorney's fee award under 42 U.S.C. § 1988." *Bogan v. Sandoval Cty. Planning & Zoning Comm'n*, 1994-NMCA-157, ¶ 44, 119 N.M. 334, 890 P.2d 395. As explained above, Kane has no federal, constitutionally-guaranteed right to maintain active City employment while simultaneously seeking or holding elective public state office. Thus, Kane is not entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

42

# III. CONCLUSION

{61}     The City's employment regulations do not violate the First Amendment of the United States Constitution. Also, these restrictions do not violate Article VII, Section 2 of the New Mexico Constitution. Moreover, Section 10-7F-9 is not a general law preempting the City's employment regulations as applied to hazardous duty officers. We therefore reverse the district court's decision on the merits as well as its award of attorney's fees.

{62}     **IT IS SO ORDERED.**


_____
**EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**

_____

**SARAH C. BACKUS, Judge**
**Sitting by designation**

**RICHARD C. BOSSON, Justice, specially concurring**

**BOSSON, Justice (specially concurring)**

{63}    We say in this opinion that the City of Albuquerque is not precluding Kane from holding elective office, only from holding city employment while she does so. The City is imposing a condition on employment, not on elective office. But is that really what is going on here? Kane, a career official in the fire department, has the "freedom" to run for office; all she has to do is walk away from her career. Some choice!

{64}    It seems to me that the City's employee regulations, stripped of labels and pretense, are exactly what they appear to be. They are a public policy choice by the City to keep its employees away from politics and specifically away from running for office. That policy choice is rooted in history. The Legislature created the same wall for state employees a generation ago. Section 10-9-21(B). Around the same time, the Legislature passed Section 3-13-4 which allowed municipalities to enact a similar merit system that would include employee "restrictions on political activities." Presumably, holding elective office would constitute prohibited "political activity."

{65}    I acknowledge that this very Court a generation ago characterized the State Personnel Act as a restriction on employment only, not on elected office. "No effort is being made to impose any restriction upon the elective public office which [the

petitioner Jerry Manzagol] holds or upon him as the holder of that office." *Manzagol,* 1975-NMSC-002, ¶ 13. I call that statement misdirection, not reality. Jerry Manzagol, in order to keep his job with the state, was compelled to surrender his position as Santa Fe City Councilor, to which he had been duly elected by the citizens of that city. He had very little choice if he wanted to keep his job. We made a mistake with that language forty years ago; I do not know why we would repeat it today.

{66}     In truth, is this not a little of both, a condition on employment *and* a prohibition on holding elective public office? We do ourselves no harm with such an acknowledgment. Back in the 1960s, to lay the groundwork for the State Personnel Act (and by extension the Albuquerque City Charter), the Legislature and the electorate combined to amend Article 7, Section 2 of the New Mexico Constitution. The Legislature passed Section 2(B) as an exception to Section 2(A), saying in effect that the Legislature may do in a merit-based personnel act for public employees what Section 2(A) would otherwise prohibit—imposing an additional qualification on holding elective public office. The result: everyone is qualified to hold "any elective public office" except as provided in Section 2(B) for public employees.

{67}     The Constitution did not need amending just to pass a personnel act; it needed amending to pass a personnel act that restricted the right to hold elective public

46

office, a restriction that would otherwise have run afoul of Section 2(A). That is exactly why the people went to all the trouble to amend Section 2. Implicitly, this Court acknowledged as much, ironically, in the same *Manzagol* opinion. "Clearly, the Legislature had the constitutional power under art. 7, § 2, subd. B, to enact 5-4-42(B), and to thereby provide, as a qualification or standard for his continued employment by the State in a position covered by the State Personnel Act, that he not hold 'political office.'" *Manzagol*, 1975-NMSC-002, ¶ 13 (internal citations omitted). In other words, but for Section B, Section A might very well have been a problem with respect to any ban on holding elective public office.

{68}     And so, Albuquerque's restrictions on its employees from holding elective public office are consistent with the New Mexico Constitution. I concede the point and agree with the result reached in the Court's opinion. Having conceded the legality of the City's position toward its employee, I could stop there. The wisdom of such a policy—its prudence as a matter of sound public policy—is a matter of legislative discretion, not judicial determination.

{69}     But the history of our Constitution suggests that the two cannot always be neatly separated. Our state Founders created a volunteer legislature, one that envisioned public-minded citizens from all walks of life, those who would make the

47

personal sacrifice to come to Santa Fe each year to conduct the people's business. The Founders offered these volunteers little help—inadequate time and no compensation. But the Founders welcomed all who would serve, including presumably public employees.

{70} True to the spirit of those Founders, we as a society need those volunteers today more than ever. We need their talent, their energy, and their vision, all attributes that can be found in both sectors of our economy, public and private. The public sector is infinitely larger now than in the days of our founding. We should be wary of eliminating whole areas of our society from the potential gene pool from which our best and brightest might be called to Santa Fe. There must be better ways, designed with greater precision, to protect civil service from the excesses of political intrigue than an across-the-board, absolute ban. The City of Albuquerque has benefitted in the past from the service of its municipal employees in the state Legislature. Representative Kiki Saavedra is but one who comes to mind. The value of their continued service should, at very least, be subject to intelligent public debate. The stakes at hand, and our continued need for quality legislative service, merit no less.

48

_____
**RICHARD C. BOSSON, Justice**